# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GREAT HILL EQUITY PARTNERS IV, LP, GREAT HILL INVESTORS LLC, FREMONT HOLDCO, INC., and BLUESNAP, INC. (F/K/A PLIMUS), | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 7906-VCG |
| SIG GROWTH EQUITY FUND I, LLLP, SIG GROWTH EQUITY MANAGEMENT, LLC, AMIR GOLDMAN, JONATHAN KLAHR, HAGAI TAL, TOMER HERZOG, DANIEL KLEINBERG, IRIT SEGAL ITSHAYEK, DONORS CAPITAL FUND, INC., and KIDS CONNECT CHARITABLE FUND, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 13, 2014
Date Decided: November 26, 2014

Gregory V. Varallo, Rudolf Koch, and Robert L. Burns, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Stephen D. Poss, Kathryn L. Alessi, and Adam Slutsky, of GOODWIN PROCTER LLP, Boston, Massachusetts, Attorneys for Plaintiffs.

David J. Margules, of BALLARD SPAHR LLP, Wilmington, Delaware; OF COUNSEL: M. Norman Goldberger, Laura E. Krabill, and William B. Igoe, of BALLARD SPAHR LLP, Philadelphia, Pennsylvania, Attorneys for Defendants SIG Growth Equity Management, LLC, SIG Growth Equity Fund I, LLLP, Amir Goldman, Jonathan Klahr, Donors Capital Fund, Inc., Kids Connect Charitable Fund, Daniel Kleinberg, and Tomer Herzog; Peter N. Flocos, of K&L GATES LLP,

New York, New York, Attorneys for Defendants Daniel Kleinberg and Tomer Herzog.

David S. Eagle and Sean M. Brennecke, of KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; OF COUNSEL: Michael K. Coran, of KLEHR HARRISON HARVEY BRANZBURG LLP, Philadelphia, Pennsylvania, Attorneys for Defendants Hagai Tal and Irit Segal Itshayek.

GLASSCOCK, Vice Chancellor

This matter involves certain Defendants' motion to dismiss claims against them, arising from the Plaintiffs' purchase of Plimus, a company in the business of facilitating payment to sellers of goods online. Plimus's business model was dependent on its relationship with entities that facilitated payment from buyers—notably Paymentech and PayPal, with which the majority of Plimus's revenue was associated. The Amended Complaint alleges that the Plimus executives who negotiated the contract made fraudulent misrepresentations in connection with the sale, withholding the information that Plimus's relationship with Paymentech had been terminated by Paymentech, and that its relationship with PayPal was also about to be terminated. As a result of this fraud, argue Plaintiffs, they paid for what they believed was a thriving company but got a near-moribund operation instead. The Plaintiffs seek contractual damages as well as recovery from two executives who negotiated the contract, based on fraud. The latter claims are not the subject of this motion to dismiss, and I assume for purposes of this motion that the complaint adequately pleads fraud against these two executives.

The Amended Complaint also seeks to recover against four members of the board of directors, a major Plimus investor, and that investor's registered agent, which served as the stockholders' representative, for fraud and/or for conspiring with and aiding and abetting the executives in their fraudulent acts, in addition to claims for indemnification and unjust enrichment. The Plaintiffs also seek to

3

recover from two other investors for indemnification and/or unjust enrichment. These Defendants move to dismiss under Rule 12(b)(6), alleging, among other things, failure to plead fraud with specificity as required under Chancery Rule 9. For the reasons that follow, these Moving Defendants' Motion is largely denied.

## I. BACKGROUND FACTS

### A. *The Parties and Business*

Plimus[1] is an e-commerce payment processing business incorporated in California, with its principal place of business in Waltham, Massachusetts.[2] Plimus provides online tools, including a payment clearance platform, to its clients, sellers of online goods and digital content including video games, music, and software.[3] Through this platform, Plimus acts as a payment intermediary between its clients and purchasers of its clients' electronic wares and services.[4] Online sellers typically use Plimus because they "lack the business experience necessary

---

[1] Plimus has since been renamed BlueSnap, Inc., but is referred to in this Memorandum Opinion, as it was during briefing and oral argument, by its pre-merger name. Unless otherwise noted, in this Background Facts section I consider only those facts recounted in the Plaintiffs' Amended Complaint or derived from the documents incorporated by reference therein. *See, e.g.*, *Farmers for Fairness v. Kent Cnty. Levy Court*, 2012 WL 295060, at *3 n.13 (Del. Ch. Jan. 27, 2012).

[2] Am. Compl. ¶¶ 2, 23; *see also id.* ¶ 43 (describing Plimus as "a provider of integrated e-commerce and payment solutions that enable digital goods and content sellers . . . to sell their products and services over the internet to consumers"). The Plaintiffs explain that Plimus is a named plaintiff because "the Merger Agreement provides that Plimus, the Surviving Corporation under the Merger Agreement, is among the parties entitled to indemnification . . . ." *Id.* ¶ 23.

[3] *Id.* ¶¶ 2, 43–45, 51.

[4] *Id.* ¶¶ 2, 44–45.

4

to fulfill the payment-processing function themselves, lack the infrastructure or scale to do so, or both."[5]

To deliver its payment platform, Plimus also acts as an intermediary between its clients and payment processors that "deal directly with the major credit card companies," such as PayPal, Inc. ("PayPal").[6] In the Plaintiffs' words:

> For transactions where a consumer of Plimus's clients chooses to use a credit card, the payment processor serves as an intermediary between the credit card association and Plimus, who in turn acts [as] an intermediary between Plimus's clients and the payment processor, to process the credit card payment.[7]

Consequently, Plimus's relationships with payment processors are critical to its business model.[8] These relationships are explored in further detail below.

Prior to its acquisition, Plimus was a private company, with a five-member board of directors and a relatively concentrated ownership structure.[9] Defendant SIG Growth Equity Fund I, LLLP ("SIG Fund"), a Delaware limited liability limited partnership with its principal place of business in Pennsylvania, was Plimus's largest stockholder.[10] Defendant SIG Growth Equity Management, LLC ("SIG Management," and collectively with SIG Fund, "SIG") is a Delaware

---

[5] *Id.* ¶ 51.

[6] *Id.* ¶ 51.

[7] *Id.* ¶ 53.

[8] *See, e.g.*, *id.* ¶¶ 3, 52.

[9] *See, e.g.*, *id.* ¶ 40 (noting that, pre-merger, Plimus was "owned principally by Plimus's founders, Herzog and Kleinberg, along with SIG Fund and Tal"); *id.* ¶ 78 (noting that "Defendants Herzog and Kleinberg . . . with Tal, Goldman and Klahr, comprised the entirety of Plimus's five-member Board of Directors").

[10] *Id.* ¶¶ 2, 25.

limited liability company also based in Pennsylvania.[11] SIG Management is SIG Fund's authorized agent and, as described in further detail below, signed the merger agreement as representative of the Company's stockholders.[12]

At the time of the merger, SIG Fund held 7,957,977 shares of Plimus Series A Preferred Stock.[13] In connection with its large holding of Plimus stock, SIG designated two members to the Plimus board, Defendants Amir Goldman and Jonathan Klahr.[14] Goldman, a Managing Director at SIG Management, also served on the board of Susquehanna Growth Equity ("SGE"), the U.S.-based private equity division of the Susquehanna International Group.[15] Klahr, in addition to serving on Plimus's board, also served as a director of SIG Management and SGE.[16] Because of Goldman's position with SIG Management, and both Goldman's and Klahr's involvement with SGE, the Amended Complaint contends that these individuals directed SIG's actions.[17]

Plimus's co-founders, Defendants Tomer Herzog and Daniel Kleinberg, each owned 4,723,957 shares of Plimus common stock—a collective 44%

---

[11] *Id.* ¶ 24.
[12] *Id.* ¶¶ 24–25.
[13] *Id.* ¶ 25.
[14] *Id.* ¶ 41.
[15] *Id.* ¶ 26.
[16] *Id.* ¶ 27.
[17] *Id.* ¶¶ 26–27.

ownership stake in the Company.[18] Herzog and Kleinberg also served on the Plimus board, and Herzog additionally served as the President of Plimus.[19]

Prior to closing, Plimus's CEO was Defendant Hagai Tal, who also sat on the board and owned 881,500 shares of Plimus common stock.[20] Defendant Irit Segal Itshayek served as Plimus's Vice President of Financial Strategy and Payment Solutions.[21]

Other stockholders of Plimus, prior to the closing, included Defendant Donors Capital Fund, Inc. ("Donors Capital"), a Maryland corporation that owned 1,449,000 shares of Plimus's Series A Preferred Stock, and Defendant Kids Connect Charitable Fund ("Kids Connect"), a Virginia corporation that owned 351,000 shares of Series A Preferred Stock.[22]

*B. The Merger*

In late 2010, Plimus's board and SIG decided to explore a possible sale of the Company.[23] Perkins Coie, the Company's outside legal counsel, stepped in to advise on the sale; the Company also retained investment banking firm Raymond James.[24] In connection with the sales process, Plimus and its investment bankers

---

[18] *Id.* ¶¶ 29–30, 42.
[19] *Id.* ¶¶ 29–30.
[20] *Id.* ¶ 28.
[21] *Id.* ¶ 31.
[22] *Id.* ¶¶ 32–33.
[23] *Id.* ¶ 60.
[24] *Id.*

prepared a sales document entitled "Confidential Information Memorandum."[25] This Memorandum contained detailed information about Plimus's business model, leadership, historical successes, and financial projections and prospects, among other things.[26]

Among those companies interested in acquiring Plimus were Great Hill Equity Partners IV, LP, a Delaware limited partnership headquartered in Boston, and Great Hill Investors LLC, a Massachusetts limited liability company also headquartered in Boston (collectively, "Great Hill"). In early February 2011, Great Hill signed a non-disclosure agreement with the Company,[27] and in late February, Plimus sent Great Hill the Confidential Information Memorandum.[28] Great Hill also received access to the data room set up by Plimus to facilitate information sharing with prospective bidders.[29]

On May 18, 2011, Great Hill submitted a bid letter to Plimus, indicating that it valued the Company at approximately $115 million.[30] On May 26, Great Hill

---

[25] *Id.* ¶ 46; *see also id.* ("On information and belief, [Tal, Segal Itshayek, SIG, Klahr, Goldman, Herzog and Kleinberg] were familiar with, approved and authorized the contents of the Confidential Information Memorandum, were aware that the statements and information set forth in it would be material and highly important to Great Hill and other potential buyers, and knew that Great Hill would rely upon the information in this memorandum in submitting its bid to purchase Plimus, in negotiating and entering into the Merger Agreements, and in closing the Merger.").

[26] *Id.*; *see also id.* ¶¶ 47–50, 60.

[27] *Id.* ¶ 63.

[28] *Id.* ¶ 46.

[29] *Id.* ¶¶ 61, 63.

[30] *Id.* ¶ 63.

and Plimus entered into a letter agreement outlining the basic terms of a potential acquisition (the "Letter Agreement").[31] The Letter Agreement reiterated that Great Hill valued the Company at $115 million, and granted Great Hill an exclusivity period in which the parties could negotiate the terms of a definitive agreement.[32] During the negotiation process, Great Hill, aided by counsel and its expert due diligence consultants, including PricewaterhouseCoopers LLP, engaged in extensive due diligence, involving, among other things, exchanges of written questions and responses as well as face-to-face meetings and telephone conversations between Great Hill representatives and Plimus management.[33]

The Plaintiffs claim that the individual Defendants were actively involved in this sales process. The Amended Complaint alleges that Goldman and Klahr attended board meetings and received a variety of information about the Company in connection with their director roles and "through SIG's information rights as a major stockholder in Plimus;" they both also had access to the data room.[34] Additionally, the Plaintiffs allege that Herzog and Kleinberg were "active participants in Plimus's business and the sales process;" during the sales process, both of these co-founders "sought and obtained access to the materials in the data room; repeatedly requested and received regular written updates from the

---

[31] *Id.*
[32] *Id.*
[33] *Id.* ¶ 64.
[34] *Id.* ¶¶ 41, 61.

Company's investment banker and management concerning the sales process; and participated in regular telephonic meetings with Tal, SIG directors Goldman and Klahr, and Raymond James concerning the sales process."[35]

Following extensive negotiations and diligence, Great Hill contracted to acquire Plimus for $115 million through merger entities Fremont Holdco, Inc. ("Fremont"), a Delaware corporation based in Massachusetts, and its wholly-owned subsidiary Fremont Merger Sub, Inc.[36] On August 3, 2011, Fremont, Fremont Merger Sub, Inc., Plimus, SIG Management, and certain "Effective Time Holders" (as explained below[37]) entered into an Agreement and Plan of Merger (the "Original Merger Agreement"). On September 29, an Amended Agreement and Plan of Merger (the "Amended Merger Agreement"), with substantially the same terms, was executed among Fremont, Fremont Merger Sub, Inc., Plimus, SIG Management, Herzog, Kleinberg, Tal, and SIG Fund.[38] While Fremont Holdco, Fremont Merger Sub, Inc., and Plimus are bound by the entire Amended Merger Agreement, Herzog, Kleinberg, Tal, and SIG Fund only signed the Amended Merger Agreement in connection with Section 5.06—the Agreement's non-

---

[35] *Id.* ¶ 42.

[36] Am. Compl. Ex. A at 1 [hereinafter Original Merger Agreement].

[37] *See infra* Part I.*F*.

[38] The Plaintiffs note that "[t]he parties entered into the [Amended] Merger Agreement to reflect certain changes in the Original Merger Agreement's description of the structuring and mechanics of the transaction, but did not make any substantive changes to the terms of the agreement, including to Plimus's representations and warranties." *Id.* at 2 n.3.

compete, non-solicit, and confidentiality provisions.[39]  Further, SIG Management, which executed the Amended Merger Agreement on behalf of the Effective Time Holders as Stockholders' Representative, only entered into certain sections of the Amended Merger Agreement.[40]

The parties closed the merger on September 29, 2011.  The Plaintiffs allege that, in connection with the transaction, SIG Fund received over $50.17 million, Donors Capital received over $9 million, Kids Connect received over $2.2 million, Herzog and Kleinberg each received over $21.1 million, and Tal received over $5.2 million.[41]

*C. Plimus's Payment Processing Relationships*

The current dispute between the parties revolves around material information that was allegedly withheld from the Plaintiffs during the sales process, concerning the status and cause of Plimus's deteriorating relationships with its major payment processors.  The Amended Complaint explains that Plimus's relationships with payment processors are critical to its payment platform. As a May 2010 PowerPoint presentation prepared by Company management and sent to Great Hill on August 29, 2011—after the parties entered into the Original

---

[39] *See* Am. Compl. Ex. B [hereinafter Am. Merger Agreement] (Signature Pages).
[40] Am. Compl. ¶ 24. Specifically, SIG Management executed the Amended Merger Agreement in connection with Sections 2.09, 2.10, 2.15, 5.06(c), 5.06(d), 6.02, 7.01, 7.03, 7.08, 9.02, 10.05, 10.12, 11.02, 11.04, 11.05, and Article 12.  Am. Merger Agreement at 1.
[41] *Id.* ¶¶ 163–68.

Merger Agreement—noted, Plimus's relationships with payment processors were "one of the most significant and material relationships our company has."[42] This presentation further reiterated that "[w]ithout these relationships our business cannot exist. They are our gateway to all credit card issuers and additional payment methods outside the U.S."[43] As of early 2011, Plimus had agreements with several payment processors, including "key payment processor" Paymentech, LLC ("Paymentech") and PayPal, "Plimus's most important payment processor."[44] However, the Plaintiffs allege that, unbeknownst to them, these integral business relationships were in disrepair leading up to the merger—Paymentech already having unilaterally terminated its agreement prior to the merger's closing and PayPal preparing to do the same eight days after the closing—due to Plimus's violations of contractual terms and the credit card association rules, as described below.

### 1. Paymentech

Prior to Great Hill's acquisition of Plimus, Paymentech was one of Plimus's "key payment processor[s]."[45] On February 4, 2011, however, Paul Hankins, Paymentech's Associate General Counsel and Vice President, notified Plimus that

---

[42] *Id.* ¶ 3; *see also id.* ¶ 52.
[43] *Id.* ¶ 52.
[44] *Id.* ¶ 3.
[45] *Id.*

Paymentech intended to terminate the parties' processing agreements on May 5, 2011.[46] This notice provided that:

> Paymentech has previously informed Plimus, on multiple occasions, of Plimus' breach of the Agreements. Those breaches include, without limitation, submitting cross border transactions from countries which Paymentech has no license, acting as an aggregator without a license to do so, and violations of Association rules regarding the unauthorized sale of Intellectual Property (as defined by the Associations). As you are also aware, Plimus has failed to cure such breaches for a period of time in excess of 30 days.[47]

On February 9, David Romano, a Paymentech account executive, sent an email to Tal and Segal Itshayek urging Plimus to "cease all activity for any (and all) client, vendor, supplier, author, sponsored merchant, etc. in India immediately," and warning that "[p]otential fines could be in the millions of dollars."[48] On February 11, 2011, Tal sent a letter to Hankins, noting that Paymentech's "sudden termination puts an unreasonable stress on several aspects of our business for which we need to make transition [sic]."[49] Tal, on behalf of Plimus, requested a two-month extension, such that the relationship would not be terminated until July 5, 2011.[50] On February 14, in his response to Tal, Hankins agreed to postpone the termination until June 20, 2011, to give Plimus the opportunity to transition to a new provider, but conditioned the extension on Plimus being compliant with

---

[46] *Id.* ¶ 72.
[47] *Id.* ¶ 72.
[48] *Id.* ¶ 73 (emphasis omitted).
[49] *Id.* ¶ 74 (emphasis omitted).
[50] *Id.*

"merchant agreements and association rules."[51] Hankins's letter noted that Plimus was, at that time, still not in compliance with the processing agreements, as had been expressed in his previous February 4, 2011 letter.[52]

The Plaintiffs allege that because Plimus "continued to violate the Agreements and Association Rules," Paymentech rescinded its extension on March 1, 2011 and stated its intent to terminate the parties' agreements as of March 7, 2011.[53] Despite providing a March 7 termination date, however, on March 3, Roger Hart, Paymentech's General Counsel, wrote to Tal that Paymentech would extend the termination date to March 21, 2011.[54] In his letter, though, "Hart warned Plimus to 'immediately and permanently cease submitting to Paymentech any transactions representing new sales.'"[55] Hart further conveyed that Plimus would be liable for any fines or penalties associated with Plimus transactions that were levied by the credit card companies, including those "substantial fines" that "MasterCard has indicated it intends to impose . . . against Paymentech for Plimus' noncompliance with MasterCard rules."[56]

On March 7, Goldman emailed Tal and requested correspondence between Plimus and Paymentech "to be sure we [*i.e.*, SIG, Goldman, and Klahr] are up to

---

[51] *Id.* ¶ 75.
[52] *Id.*
[53] *Id.* ¶ 7; *see also id.* ¶ 76.
[54] *Id.* ¶ 77.
[55] *Id.* (emphasis omitted).
[56] *Id.* (emphasis omitted).

speed on that here."[57]   Tal responded to Goldman's request on or around March 18.[58]   On March 20, Klahr emailed Tal, requesting that he provide the same correspondence to Herzog and Kleinberg, "who, with Tal, Goldman and Klahr, comprised the entirety of Plimus's five-member Board of Directors;" Klahr also noted that he and Goldman had "questions we would like to ask [Perkins Coie] about the deal and also about Paymentech."[59]   Meanwhile, on March 18, Plimus's counsel at Perkins Coie had sent an email to Paymentech's General Counsel, copying Goldman, Klahr and Tal, informing Paymentech that Perkins Coie had "been retained by [Plimus] to represent it in connection with Paymentech's unilateral termination of the agreements between Plimus and Paymentech and the attendant winding down process."[60]   Plimus counsel also expressed that the withholding of funds by Paymentech in connection with the termination "has and will continue to have a detrimental effect on Plimus' business—especially during this time of intensive transition."[61]

The Plaintiffs allege that on March 21, 2011, per Paymentech's General Counsel's notice, Paymentech terminated its relationship with Plimus.[62]   The following day, "Klahr forwarded to Herzog and Kleinberg the Company's

---

[57] *Id.* ¶ 78.
[58] *Id.*
[59] *Id.*
[60] *Id.* ¶ 79 (emphasis omitted).  *See generally* Margules Affirmation Ex. 1.
[61] Am. Compl. ¶ 7 (emphasis omitted); *see also id.* ¶ 79.  *See generally* Margules Affirmation Ex. 1.
[62] *Id.* ¶ 7.

15

correspondence with Paymentech, including Perkins Coie's March 18 letter to Paymentech."[63]   Through a separate email, Klahr requested that Herzog and Kleinberg provide him a time they could speak by telephone.[64]   The Plaintiffs believe that "at least Klahr, Herzog and Kleinberg spoke by telephone on March 22 regarding Paymentech's termination of the Plimus relationship."[65]

### 2. PayPal

According to the Plaintiffs, by the time of the merger, the same problems that led to the termination of the Paymentech relationship were already destroying Plimus's even more important relationship with PayPal.  Leading up to the merger, the Plaintiffs allege, PayPal served as the Company's "most important payment processor."[66]   In the third quarter of 2011, for instance, PayPal processed approximately 66% of Plimus's total payments.[67]   Through its agreement with PayPal, Plimus could offer to its clients "the PayPal payment mechanism,"[68] which includes both PayPal credit card payment processing services and the PayPal Wallet, an e-commerce payment mechanism with 132 million users in 133

---

[63] *Id.* ¶ 80.
[64] *Id.*
[65] *Id.*
[66] *Id.* ¶ 5(b).
[67] *Id.* ¶ 9; *see also id.* ¶ 53.
[68] *Id.* ¶ 59.

16

countries.[69] The Plaintiffs describe the symbiotic business relationship between Plimus and PayPal as follows:

> Plimus maintained several of its own PayPal accounts, which functioned as master accounts. Plimus then assigned its clients individual sub-accounts organized underneath Plimus's master accounts. Because those clients maintained sub-accounts to Plimus's master accounts, rather than separate accounts of their own directly with PayPal, Plimus was able to deduct and add monies to those sub-accounts and fully administer its clients' sales with no legwork necessary by those clients—one of the reasons the clients sought Plimus as a business partner.[70]

Beginning in June 2011, however—shortly after the Company's relationship with Paymentech had been terminated—the relationship between Plimus and PayPal became similarly strained by Plimus's violations of the credit card association rules and related breaches of the parties' agreements. The Plaintiffs claim that "[t]he same inability or unwillingness of the Defendants to comply with the chargeback rules and other card association rules that led to the March 2011 Paymentech termination soon led to a crisis with PayPal."[71] In fact, the Plaintiffs claim, rather than attempt to remedy the underlying breaches and "[d]espite Paymentech's March 2011 termination of Plimus due to Plimus's repeated breaches of the Paymentech agreement and the card association rules due to

---

[69] *Id.* ¶ 56.
[70] *Id.* ¶ 59.
[71] *Id.* ¶ 89.

17

excessive chargebacks, in April 2011 Tal caused Plimus to take on numerous new high risk clients."[72]

> a. The MasterCard BRAM Program

MasterCard has developed a business risk-monitoring program, the Business Risk Assessment & Mitigation Programs (the "BRAM Program"),

> whereby MasterCard monitors and enforces compliance with its rules and regulations by sellers and seeks to identify transactions that may cause legal, risk, and regulatory problems to the MasterCard brand. Through the program, MasterCard also monitors sellers who it knows have a history of violations, and further monitors those entities choosing to do business with such sellers.[73]

According to the Amended Complaint, violations of the BRAM Program are taken "extremely serious[ly]" within the payment processing industry, as they "can often result in MasterCard terminating its relationships with a credit card payment processor or MasterCard ordering a credit card payment processor to cease doing business with sellers and entities related to those sellers."[74] Under this Program,

> MasterCard retains sole discretion to terminate its relationship with a credit card payment processor in the event of a BRAM violation. . . . MasterCard may also impose significant fines, fees, or penalties for

---

[72] *Id.* ¶ 88 (contending that "[t]his was a classic scheme to attempt to maintain the illusion of Plimus's continued growth and profitability while Great Hill was considering how much to offer for Plimus," and that it was "directly contrary to the financial picture of stable, recurring and growing clients, revenues and profits the Defendants had portrayed to Great Hill").

[73] *Id.* ¶ 86.

[74] *Id.* ¶ 87.

18

participation tied to BRAM violations upon payment processors who pass on such fees to Plimus and similar entities.[75]

The Company, as a result of its contractual relationship with PayPal, was subject to the rules and regulations promulgated by MasterCard, including the BRAM Program; Plimus was also prohibited from engaging in any business activity resulting in fraudulent transactions.[76]  According to the Amended Complaint, "Plimus's relationship with PayPal was preconditioned on Plimus's compliance with the MasterCard BRAM program, and PayPal retained the right to terminate that relationship based on any violations of that program."[77]

### b. Plimus's June 2011 BRAM Violation

On June 16, 2011, three months after Paymentech terminated its relationship with Plimus, the Plaintiffs allege that Rick Lancaster, a PayPal employee who managed Plimus's account, contacted Segal Itshayek by phone, notifying her that one of Plimus's clients had "violated the MasterCard BRAM program's prohibitions against fraudulent get-rich-quick schemes."[78]  The same day, allegedly "immediately recogniz[ing] the ramifications of the June 2011 BRAM Violation," Plimus's COO emailed Segal Itshayek that "[w]e don't want the word to spread

---

[75] *Id.*; *see also id.* ¶ 9 ("[E]ven a single violation of [the BRAM Program] . . . can cause MasterCard to sever its relationships with those entities and will, at the very least, result in substantial fines and penalties.").

[76] *Id.* ¶ 92.

[77] *Id.*

[78] *Id.* ¶ 89(a).

out,"[79] and Plimus's Assi Itshayek[80] and Tal emailed Klahr and Goldman to schedule a conference call "to put adjustments to the agreement that in my eyes have [a] material financial impact."[81] Goldman responded that he and SIG's in-house counsel would participate in the call.[82] The evening of June 16, at 11:34 p.m., Tal emailed a PayPal contact, requesting a call.[83]

> On June 17, Segal Itshayek sent Lancaster a letter that stated:
>
> Following our conversation yesterday, I would like to inform you, on behalf of Plimus, the account "[Client Y]" was suspended yesterday and is being terminated from our system. . . . In addition, we have launched an internal investigation to determine if we have any similar "get rich quick" scheme accounts that will require suspension as well. We will update you on the results of this investigation early next week.[84]

On June 23, Lancaster requested a status update on Plimus's investigation.[85] Segal Itshayek responded that most of the get-rich-quick clients had already been suspended, but that "[t]here are a few that we are still investigating and most probably finalize [sic] our conclusions by the end of this week."[86] In total, Plimus terminated sixteen other accounts as a result of its internal investigation.[87]

---

[79] *Id.* ¶ 89(b).
[80] To prevent confusion with Defendant Irit Segal Itshayek, I will refer to Assi Itshayek by first name, as was done in the Amended Complaint. No disrespect is intended.
[81] Am. Compl. ¶ 89(b).
[82] *Id.*
[83] *Id.*
[84] *Id.* ¶ 89(c) (emphasis omitted).
[85] *Id.* ¶ 89(d).
[86] *Id.*
[87] *Id.*

According to the Plaintiffs, Tal and Segal Itshayek communicated this information regarding the termination of clients to Great Hill in June 2011, including the representation that "Plimus did not need to terminate any additional clients due to excessive chargeback ratios, and that the termination of this small group of clients fixed the problem."[88] The Amended Complaint alleges that "[d]uring this period of back-and-forth between Plimus and PayPal, Tal and SIG were communicating by telephone, including an eighteen-minute call on June 22, a sixteen-minute call on June 26, and a fifteen-minute call on June 28."[89]

As a result of Plimus's client's violation, PayPal charged Plimus a $200,000 fine, passing on the fine MasterCard had charged PayPal for breaching its brand integrity rules.[90] Segal Itshayek became aware of the fine on September 22, 2011.[91] The Amended Complaint contends that "[t]he fine was clearly recognized by several of the [] Defendants as a major problem," and that "[d]uring the two-day period following PayPal's notification of the fine . . . Tal emailed Goldman to call him, and Tal (and others at Plimus) exchanged at least seven phone calls with SIG, including Klahr."[92]

c. August 2011 BRAM/Aggregation Violation

---

[88] *Id.* ¶ 104.
[89] *Id.* ¶ 89(e).
[90] *Id.* ¶¶ 5(b), 138.
[91] *Id.* ¶ 138.
[92] *Id.*

The Plaintiffs contend that concurrent with Plimus's June 2011 BRAM violation, PayPal began expressing concern that Plimus was also violating another of MasterCard's BRAM rules by acting as an aggregator, instead of a reseller.[93] To be acting as an aggregator, which is prohibited by the BRAM Program, meant that "Plimus was using its own merchant account in an unauthorized manner to aggregate and process transactions for its clients, rather than acting as a reseller by purchasing is clients' products and re-selling those products to end-users."[94] On June 21, Lancaster, PayPal's account representative for Plimus, informed Segal Itshayek that:

> PayPal needs to obtain a letter from you outlining the business model for Plimus that we can provide to the Card Association. In that letter you need to explain why you are not aggregating and how you purchase the product from the merchant and resell it to the end user.[95]

Segal Itshayek responded later that day.[96] In August 2011, PayPal communicated to Segal Itshayek and Plimus employee Jason Edge that MasterCard considered Plimus in violation of its aggregation rules, and was levying a $500,000 fine against the Company; Plimus eventually negotiated this fine down to $400,000.[97]

### d. Chargeback Violations

---

[93] *Id.* ¶ 10. Notably, by this time Paymentech had allegedly previously conveyed that Plimus had breached its agreements by "acting as an aggregator without a license to do so." *Id.* ¶ 72.
[94] *Id.* ¶ 5(b).
[95] *Id.* ¶ 90 (internal quotation marks omitted).
[96] *Id.* ¶ 91.
[97] *Id.* ¶¶ 10, 157.

In the wake of the June 2011 BRAM violation, PayPal additionally required Plimus "to submit a written plan to reduce chargebacks."[98] As defined by the Amended Complaint, "chargebacks" are "reversals by credit card associations of credit card charges that consumers successfully dispute."[99] Credit card associations and their sponsor banks set maximum thresholds for the percentage of chargeback transactions that are tolerated; for U.S.-based transactions, the chargeback threshold is typically 1.0%.[100] Notably here, "[c]redit card associations and payment processors regularly monitor chargeback ratios for transactions originating from Plimus and similar companies, which are subject to penalties—including termination—for exceeding that 1.0% threshold."[101]

During the summer of 2011, Plimus's chargeback ratio exceeded the permissible thresholds.[102] On August 4, 2011, PayPal's account representative Lancaster contacted Plimus's Edge, notifying him that the Company had exceeded the 1.0% chargeback threshold in both June and July 2011; Edge forwarded this

---

[98] *Id.* ¶ 102.

[99] *Id.* ¶ 5(b); *see also* ¶ 102 ("Chargebacks occur when a consumer who has charged a purchase on a credit card contacts the issuing bank and successfully disputes one or more transactions on the credit card statement. The transaction is 'charged back,' meaning it is reversed by the credit card association so that the consumer is not responsible for the payment on that transaction.").

[100] *Id.* at 12 & n.5.

[101] *Id.* ¶ 12; *see also id.* ¶ 102 ("Processors—such as PayPal and Paymentech—that process Visa and MasterCard U.S. transactions require that Plimus and other similar companies maintain chargeback ratios within the 1.0% chargeback threshold set by the U.S. credit card associations.").

[102] *Id.* ¶ 5(b).

email to Segal Itshayek that same day.[103]  Thereafter, PayPal monitored the chargebacks of Plimus's clients on a weekly basis, while representatives of Plimus and PayPal held weekly meetings to address PayPal's concerns with excessive chargebacks.[104]

On August 11, Lancaster and Edge spoke on the telephone about Plimus's chargeback violations.[105]  That same day, Edge sent Tal and Segal Itshayek a draft email ultimately intended for PayPal, describing the content of the call.  This draft email noted that:

> 1.  Plimus has had MasterCard Violations above 1% in June and July 2011.  If after the August numbers are finalized and if Plimus exceeds 1% the 3rd month in a row PayPal will issue a 30 day notice to potentially shut down Plimus' ability to process on the [PayPal] Pro account unless numbers improve.
>
> 2.  PayPal also received notice from Visa regarding a specific violator, [Client X], as Plimus previously discussed with PayPal this vendor was shut down July 11 . . . .[106]

Segal Itshayek responded to Edge with the following feedback: "[R]emove [paragraphs] 1 and 2 . . . .  Just keep the steps we r [sic] taking . . . .  The rest will be communicated verbally."[107]

---

[103] *Id.* ¶ 117.
[104] *Id.*
[105] *Id.* ¶ 118.
[106] *Id.* ¶ 120 (emphasis omitted).
[107] *Id.*

Primus communicated the issue regarding Client X, contained in the second paragraph of Edge's draft email, to Great Hill on September 23 in connection with the Amended Merger Agreement's Supplemental Disclosure; that disclosure followed a September 21 email by Klahr to Segal Itshayek asking her for "the Visa non-compliance notice dated from August 10."[108]  However, according to the Plaintiffs, Plimus failed to disclose to Great hill pre-closing the larger issue contained in the first paragraph of Edge's draft email—PayPal potentially terminating its payment-processing relationship with Plimus if chargeback ratios did not improve.[109]  Even without this information, though, Great Hill appeared concerned by the information that Plimus did disclose concerning Client X's chargebacks; on the heels of the supplemental disclosure regarding Client X, Great Hill principal Christopher Busby asked Tal to "describe what happened and any potential consequences," and Great Hill counsel also asked Plimus's counsel to describe "the risk to Plimus" stemming from PayPal's inquiry into Client X's

---

[108] *Id.* ¶ 139; *see also id.* ¶ 140 (noting that that disclosure read: "On August 16, 2011, the company's account manager at PayPal contacted the Company following a request made by Visa of information regarding [Client X], entity that used the Company's platform.  The basis for such request was a chargeback ratio level for [Client X] of 1.65%.  The Company provided responsive information to PayPal's request.").

[109] *See, e.g.*, *id.* ¶ 142 ("Plimus intended the narrow, incomplete and intentionally deceptive disclosure about Client X to conceal the truth from Great Hill as it omitted the most important facts—that Plimus had received notice of the June 2011 BRAM Violation, that Plimus had exceeded the PayPal 1.0% chargeback ratio in July, that PayPal had threatened to terminate its payment processing relationship if Plimus again exceeded the ration during August, that Plimus in fact exceeded the ratio in August, and that termination of the PayPal account was imminent.").

violations.[110]   The Company's counsel emailed Great Hill's counsel, acknowledging that the violation from Client X was "arguably responsive" to Plimus's representations in the Amended Merger Agreement "as an exception to compliance with the PayPal contract terms," but assuring Great Hill that "Plimus is taking steps to mitigate any further violations."[111]

e. Plimus Reacts to the Chargeback Violations

The Plaintiffs allege that, to remedy these chargeback issues and thus retain its relationship with PayPal, Plimus would have had "to terminate broad categories of clients that offered services and products that credit card associations considered high-risk."[112]  However, according to the Amended Complaint, in August of 2011, Plimus management instead implemented a three-pronged strategy, "many of the plan components" of which were merely "a continuation of activities that Plimus had begun in June and July," to "hide the PayPal problems long enough to keep them from becoming known to Great Hill prior to the September 29 closing of the Merger."[113]

First, the Plaintiffs allege that Plimus engaged in "client trimming," meaning that, instead of severing Plimus's relationship with high-risk clients—*i.e.* those that yielded excessive chargebacks—"Tal instructed Plimus employees to keep some

---

[110] *Id.* ¶ 141
[111] *Id.* (emphasis omitted).
[112] *Id.* ¶ 5(c).
[113] *Id.* ¶ 124.

high-risk (but revenue generating) clients active until after the closing."[114] Second, the Plaintiffs allege that Tal and Segal Itshayek directed Plimus employees to issue mass refunds that "preemptively refunded money to consumers who had purchased from Plimus clients expected to generate high chargebacks, thus preempting those consumers from disputing the transaction and thereby covering up the reality of chargebacks."[115] Third, the Plaintiffs allege that Tal and Segal Itshayek engaged in "volume shifting" by "identify[ing] 'clean' transactions on payment processors other than PayPal and shift[ing] those transactions to PayPal," while contemporaneously "shift[ing] high-chargeback volumes from PayPal onto another processor."[116] Volume shifting would have likely involved shifting high chargeback volumes onto European payment processors because the chargeback ratios for European payment processers are generally higher than those in the United States.[117] According to the Amended Complaint, this three-pronged approach was designed "to hold the company's payment processors at bay" while "fraudulently maintain[ing] the appearance of Plimus's revenues and profits and avoid[ing] the inevitable need to terminate broad categories of high-risk clients . . . until Plimus could close the Merger."[118]

---

[114] *Id.* ¶ 14(a); *see also id.* ¶¶ 125–26.
[115] *Id.* ¶ 14(b); *see also id.* ¶ 128.
[116] *Id.* ¶ 14(c); *see also id.* ¶ 129.
[117] *Id.* ¶ 129.
[118] *Id.* ¶ 14.

f. PayPal Terminates the Relationship

Plimus management's three-pronged plan to stave off another payment processor termination was briefly successful, but the Amended Complaint alleges that in August 2011 PayPal renewed its threat "to terminate its relationship with Plimus because of the Company's repeated violations of the credit card associations' rules," including those breaches described above—Plimus's BRAM violations and the excessive client chargebacks during the summer of 2011.[119] As mentioned above, PayPal had allegedly already notified the Company that it "would terminate its relationship with Plimus if Plimus, having violated the permissible ratios in both June and July 2011, failed yet again to reduce chargeback levels below the acceptable threshold in August 2011."[120] On August 17, a PayPal employee notified Segal Itshayek and Tal that the Company was "on pace to exceed [in August] the total number of chargebacks that you had last month."[121]

The Plaintiffs allege that, in light of the notice of another looming violation, both Tal and Segal Itshayek requested extensions from PayPal on behalf of

---

[119] *Id.* ¶ 5(b).

[120] *Id.* ¶ 5(c); *see also id.* ¶ 131 (describing an employee's "August 15, 2012 post-mortem to Plimus's new CEO regarding PayPal's dissatisfaction with Plimus's excessive chargebacks: 'Once Paymentech closed us (prior to PayPal) we move [sic] a lot of the US [credit card] processing to PayPal. This plus the fact that we were processing shady sellers increased our charge back ratio to be over 1% for at least 6 month [sic]. MasterCard and Visa did not like it and PayPal were [sic] very unhappy." (emphasis omitted)).

[121] *Id.* ¶ 122 (internal quotation marks omitted).

Plimus,[122] while others at Plimus worked to foster an arrangement with another payment processor.[123] On September 9, Segal Itshayek wrote to PayPal, admitting that the 1% chargeback ratio had been exceeded for June, July, and August.[124] In this email, Segal Itshayek requested a one-month extension before its relationship with PayPal was terminated:

> As we see PayPal as one of our strategic partners and would like to continue working together, we would highly appreciate receiving one additional month to prove the actions taken by Plimus to reduce and control the [chargeback] ratio and general risk.[125]

PayPal agreed to the extension.[126] On September 26, a Plimus employee recounted a conversation he had with a PayPal representative in an email to Segal Itshayek, noting that this representative "went over the list of vendors and products . . . and identified the following product types prohibited by PayPal and considered as high risk by the association and that we should shut down if we want to keep our

---

[122] *See, e.g.*, *id.* ¶ 123 (noting that, on August 18, Tal emailed a PayPal employee, communicating "that Plimus needed help with PayPal in the form of a 30 day extension for the account, because Tal feared that he would receive a letter at the end of the month under which Plimus would have 30 days to disconnect").

[123] *Id.* ¶ 133 (noting that, on August 30, Perach Raccah, Plimus's Chief Operating Officer, sent an email to another Plimus employee that "task number 1 is integration to [Litle, another payment processor]. Basically we need to make sure we are on production with that no later than the end of [September] . . . just in case Paypal decides to cut the relationship with us," and that, on September 5, he sent an email that noted "I need you to ensure we are on track to finish the work before the end of the month. It is critical it will be working on production before Paypal surprise us [sic]." (emphasis omitted)).

[124] *Id.* ¶ 134; *see also id.* ¶ 5(c) (noting that the chargeback threshold was violated in September as well).

[125] *Id.* ¶ 134 (emphasis omitted); *see also id.* ¶ 5(d).

[126] *See id.* ¶¶ 5(d); 16(a).

relationship with [PayPal]."[127]  The Plimus employee further noted that "we are not sure the relationship [with PayPal Pro] will continue."[128]  According to Plimus telephone records, Tal and Klahr spoke on both September 26 and 27.[129]

PayPal began terminating its payment-processor relationship with Plimus eight days after the merger closed, on October 7, 2011; by mid-December 2011, Plimus had no remaining PayPal accounts.[130]  The Amended Complaint alleges that Plimus became unable to use PayPal's credit card processing services or offer the PayPal Wallet, and, consequently, "Plimus's revenues plummeted as it lost both a substantial portion of its existing customers and a vast swath of the e-commerce market that requires access to the PayPal wallet."[131]

### 3. The Search for a Replacement Processor

Following PayPal's termination, in October 2011, Plimus contracted with another payment processor.  This new processor, however, terminated its relationship with Plimus only three months later, in January 2012, "citing as a basis for the termination the June 2011 BRAM Violation and August 2011 BRAM/Aggregation Violation and the resulting significant fines from MasterCard."[132]

---

[127] *Id.* ¶ 143 (emphasis omitted).
[128] *Id.*
[129] *Id.*
[130] *Id.* ¶¶ 5(d); 16(a), 154.
[131] *Id.* ¶ 16(a); *see also id.* ¶¶ 154–55 (describing the injury caused by the PayPal termination).
[132] *Id.* ¶ 156 (internal quotation marks omitted); *see also id.* ¶16(b).

30

*D. The Alleged Fraud*

     1. Paymentech

The Amended Complaint avers that, pre-closing, Plimus failed to disclose that it was in violation of the credit card association rules and instead misrepresented to Great Hill during diligence that "Plimus had wanted and initiated the termination of the payment-processor relationship with Paymentech"[133] The Amended Complaint further avers that the data room was devoid of any information about Paymentech's unilateral termination of the parties' relationship "because Plimus's counsel had 'scrubbed the dataroom to remove any documents pertaining to the dispute.'"[134]

Instead of maintaining information related to the Paymentech dispute in the data room, the Plaintiffs claim that Plimus chose to draft a disclosure that misinformed the remaining bidders of the situation.[135] In early May 2011, Plimus began to internally circulate a draft disclosure schedule for review addressing the Paymentech termination.[136] As of May 13, the draft version, in relevant part, provided:

---

[133] *Id.* ¶ 71.

[134] *Id.* ¶ 8 (quoting Margules Affirmation Ex. 3 P_0000018, an internal email exchanged among Plimus's counsel).

[135] *See, e.g.*, Margules Affirmation Ex. 3 at P_0000017.

[136] The Amended Complaint retraces in detail the draft disclosure schedule's path as it was traded among the Defendants as follows: On May 9, Klahr received a draft, which he forwarded to SIG's in-house counsel; on May 11, Klahr notified Perkins Coie that he was "fine" with the draft he had received; on May 12, Klahr emailed Tal and Goldman to schedule a call to discuss

In February and March 2011, Paymentech notified Plimus that it was terminating the agreements governing the Paymentech transaction-processing services for Plimus. Paymentech's stated basis for the termination was Plimus' alleged breach of the agreements and the related rules promulgated by payment brands Visa and MasterCard. The termination became effective on March 21, 2011. In connection with the winding down of Paymentech's services to Plimus, Paymentech established a Reserve Account under Sections 4.6 and 10.3 of the Merchant Agreement between Paymentech and Plimus. In that Reserve Account, Paymentech withheld approximately $2.7 million of Plimus funds. Paymentech confirmed in communications in March and April 2011 that the basis for withholding these funds was as follows: (a) to satisfy any forthcoming fines or penalties from Visa or MasterCard; (b) to cover any charge backs (and associated fees) that occur post-termination; and (c) to cover any post-termination electronic check processing.[137]

Assi sent this version to Tal for review and to "confirm [he felt] OK with it."[138]

Tal, upon receiving the disclosure, amended it heavily.[139] On May 18, Assi emailed the updated draft, incorporating Tal's edits, to Klahr, who made minor revisions "but otherwise did not question or revise the Paymentech disclosure, and signed off on that disclosure."[140] On May 18, 2011, Plimus posted this updated

---

the draft; on May 12, Assi Itshayek emailed Klahr with a copy of the draft with his annotations, indicating that he wanted "[to discuss with [a Perkins Coie attorney] how to present Paymentech;"; on May 13, SIG's in-house counsel circulated a draft to Klahr, Assi, and a Perkins Coie attorney with his comments and incorporating Assi's notation. *See* Am. Compl. ¶ 82; Margules Affirmation Ex. 2 at P_0000037.

[137] *Id.* ¶ 82(e).
[138] *Id.* ¶ 82(f).
[139] *Id.* ¶ 82(g).
[140] *Id.* ¶ 82(j).

disclosure in the data room for Great Hill to review.[141]  The updated disclosure

read, in relevant part:

> [I]n early 2011, [Plimus] decided that it did not want to continue working with [Paymentech] under the then negotiated terms of the Paymentech Agreement.  [Plimus] then attempted to negotiate modified terms with [Paymentech] on several occasions.  However, [Paymentech] refused to enter into such discussions or modify the terms of the [Paymentech] Agreement.  In February and March 2011, [Paymentech] encountered issues related to the Royal Bank of India and its ability to continue processing payments for [Plimus's] vendors then operating within India.  [Paymentech] asked [Plimus] to make specific changes to the [Plimus's] platform.  Since [Plimus] did not feel this would be in its best interests, [Plimus] and [Paymentech] instead mutually agreed to terminate the agreement governing the transaction-processing services provided by [Paymentech], effective March 21, 2011.[142]

According to the Plaintiffs, Plimus's disclosure was "deliberately false," and

concealed "crucial facts concerning Paymentech that were material to Great Hill's

decision to negotiate with Plimus, enter into the Original Merger Agreement, and

close the Merger."[143]

### 2. PayPal

The Amended Complaint likewise alleges that, prior to closing the merger,

Plimus misrepresented the state of its relationship with PayPal.  The Plaintiffs

---

[141] *Id.* ¶ 83.

[142] *Id.* ¶ 83 (emphasis omitted).

[143] *Id.* ¶ 8; *see also id.* ¶ 83 ("[W]ith knowledge and calculated approval from Tal, SIG, Klahr, and Goldman, Plimus posted in the data room for Great Hill's review on May 18, 2011, a deliberately false and misleading Paymentech disclosure, which was a dramatic and complete departure from the language that Tal, SIG, Klahr, and Goldman had reviewed just days earlier . . . .").

acknowledge that Plimus informed Great Hill that it had violated the chargeback ratio for June 2011, but the Plaintiffs claim that no one informed Great Hill that the Company had also violated this threshold for July and August.[144] Instead, the Amended Complaint avers that Great Hill "continue[d] to rely on Tal's and Segal Itshayek's representations that Plimus's PayPal chargeback ratio was below the 1.0% threshold for July 2011 and that Plimus's termination of the sixteen clients had cured the excessive chargeback problem."[145]

Further, the Plaintiffs allege that Plimus concealed PayPal's intention to terminate its payment-processing relationship with Plimus.[146] The Amended Complaint conveys that:

> Before Great Hill's entry into the Original Merger Agreement in August 2011, Great Hill directed numerous diligence requests to Plimus regarding Plimus's relationship with its payment processors, including PayPal and Paymentech, in view of the central importance of payment processing, and PayPal in particular, to Plimus's business. In fact, during the very same week that Plimus received notice of the June 2011 BRAM Violation (and a few months after Paymentech's unilateral termination of its relationship with Plimus), Great Hill asked Plimus in due diligence to describe any communications from specifically identified companies, including PayPal and MasterCard, reporting noncompliance with their rules.[147]

In addition to these specific diligence requests, the Plaintiffs allege that between June 7 and June 9, Great Hill Vice President Nicholas Cayer, Great Hill's due

---

[144] *Id.* ¶ 12.
[145] *Id.* ¶ 106.
[146] *See, e.g., id.* ¶ 12.
[147] *Id.* ¶ 94 (emphasis omitted).

34

diligence advisors from PricewaterhouseCoopers LLP, met with Plimus representatives, including Tal and Segal Itshayek, to discuss, among other things, Plimus's relationships with its payment processors.[148]  During these discussions, Plimus failed to disclose the pertinent information regarding Plimus's relationship with PayPal, including the June 2011 BRAM Violation of which Plimus had been aware shortly before Great Hill's applicable diligence request.[149]  Instead, Tal and Segal Itshayek again conveyed that Plimus had initiated the termination of its relationship with Paymentech.[150]

The Amended Complaint additionally details a variety of other fraudulent tactics Plimus allegedly engaged in during the negotiation process.  Among them, the Plaintiffs allege that "Tal instructed other Plimus employees to funnel all communications to Great Hill relating to payment processors through Tal and Segal Itshayek only, to ensure that lies, and only those lies, were communicated to Great Hill;"[151] that Plimus failed to disclose that it "had no choice but to terminate certain client categories to have a chance of preserving payment-processor relationships," or that it "instead selectively terminated certain clients and engaged in volume shifting and issued mass refunds in order to maintain fictitious revenues

---

[148] *Id.* ¶ 95.
[149] *Id.* ¶ 101.
[150] *Id.* ¶¶ 95–96.
[151] *Id.* ¶ 94.

and profits so that Great Hill would close the merger;[152] and that Plimus, primarily through Tal and Segal Itshayek, purposefully failed to fully disclose material information in response to diligence requests.[153]

*E. The Side Letter*

During the merger negotiations, Great Hill requested that Tal, as Plimus's CEO, "roll over" his equity interest in the Company,[154] which was at the time subject to a 2008 compensation agreement between Tal, Herzog, and Kleinberg (the "Compensation Agreement").[155] In connection with Great Hill's request, Tal began to indicate that he did not want to re-invest his equity, which would require him to stay with the Company, and in the United States, for longer than he had planned or wanted.[156] In mid-May, Tal emailed Herzog, Kleinberg, and SIG that he wanted to be "compensate[d] . . . for the roll-over requirement."[157] Tal further stated, "I also have to commit for 18 month and more so deal will take place [sic]," and communicated to Herzog and Kleinberg that "this [money pursuant to the

---

[152] *Id.* ¶ 18.

[153] *See, e.g.*, *id.* ¶¶ 97–100.

[154] *See id.* ¶ 17(b) (explaining that private equity buyers, such as Great Hill, often "require a CEO to 'roll over' his or her own equity into the post-deal company in order to have 'skin in the game,' demonstrate faith in the future of the business, and as a guard against executives who might be tempted to over-state a company's financial prospects to the acquiror").

[155] Answer of Def. Hagai Tal ¶ 68; *see also* Am. Compl. ¶ 68. The specific terms of the Compensation Agreement are not stated in the Amended Complaint, except that there was apparently some provision under which Tal was to receive a "bonus" for hitting certain revenue targets. *See* Margules Affirmation Ex. 4.

[156] *See, e.g.*, Am. Compl. ¶ 69 (indicating that, in a June 28 email, Tal wrote "I also need to stay in the company and in the US for longer time than I had planned, and all this for you guys to get your money").

[157] *Id.* ¶¶ 68, 17(b).

36

Compensation Agreement] will be my only income from this deal and . . . without it I have limited interest in this deal at all."[158]  Herzog responded that "a 'black-mail' style sentence like 'if you don't give me money I don't want the deal' is something that the entire board needs to hear[;] it certainly affects everyone."[159]  Aside from seeking extra-contractual payments, Tal also adopted an interpretation of the Compensation Agreement contrary to that held by the other parties to the Agreement, resulting in a dispute over the amount due.[160]  Eventually, Herzog and Tal scheduled a time to speak on the phone about these concerns.[161]

The Plaintiffs allege that the Defendants feared Tal's "wavering on the reinvestment requirement would alert Great Hill that Tal did not believe in the future prospects of the business, and thus lead to price degradation or possibly risk the entire $115 million deal."[162]  Out of this fear, the Amended Complaint avers, the Defendants began taking steps to suppress Tal's resistance, through warnings and bribery.  On May 24, Goldman, on behalf of SIG, sent Tal an email cautioning him to "not do anything that could signal to Great Hill that Tal was not a believer

---

[158] Margules Affirmation Ex. 4.
[159] *Id.*
[160] *See, e.g.*, *id* (showing Tal emailing Kleinberg and Herzog that "I have to say that I understand the contract differently from you . . . .  I do believe that you 2 [sic] have to reimburse me base [sic] on Plimus value [sic] and not on any other calculations," and Kleinberg responding that "[t]he Excel we sent you represents our understanding of our agreement[;] it is unfortunate that you miscalculated and we'll be happy to go through it with you to ensure we're on the same page").
[161] *Id.*
[162] Am. Compl. ¶ 17(b).

in the future of the business," which could jeopardize the deal; in his email, Goldman noted that "[w]hatever we get is better than zero."[163] On June 12, Klahr, on behalf of SIG, emailed Tal, warning him to "be very thoughtful and careful about what you ask for from a rollover perspective. . . . A big emphasis on liquidity is generally a big indication that [management] aren't believers."[164] On June 26, Goldman emailed Tal, indicating "he would work with Tal and Plimus's other directors to 'improve the situation' for Tal, through the use of 'contractual side letters that are very clear.'"[165] He also reiterated, at this time, that "the alternative of no deal was 'not great' for any of Plimus's directors."[166]

Eventually, the Plaintiffs allege, Tal did reach an agreement with the other director Defendants whereby Tal would roll over his equity as Great Hill requested in return for 30% more compensation than what was provided for under his 2008 Compensation Agreement (the "Side Letter"); the Amended Complaint cites as proof a July 21, 2011 email from Goldman to a Perkins Coie attorney that noted, "If you speak to [Tal] you should let him know that SGE's position is that it's [sic] additional funds to his side letter (the extra 30%) was contingent on him agreeing to roll $3m. The founders [Herzog and Kleinberg] also take the same position."[167]

---

[163] *Id.* ¶ 66.
[164] *Id.* ¶ 67.
[165] *Id.*
[166] *Id.*
[167] *Id.* ¶ 68.

In furtherance of the alleged deception, the Amended Complaint claims that the Defendants also misrepresented the circumstances surrounding the Side Letter on Tal's compensation, leading Great Hill "to believe that the total payment they were to make to Tal was owed to him under a pre-existing agreement with Tal from 2008."[168] In reality, the Amended Complaint alleges, SIG, Herzog, and Klahr paid and then concealed the additional compensation—akin to a bribe—that they used to "conceal Tal's concerns about the future of the company," preserve the deal, and secure their subsequent buyout.[169] In other words, the Plaintiffs' allegation is that Tal knew a roll-over into the new entity was a bad deal; the board compensated him for this loss but mislead Great Hill to preserve the illusion that Tal was willing to buy into its acquisition of Plimus.

### F. Post-Merger Fines and Indemnification

According to the Amended Complaint, as a result of the Defendants' fraud, Great Hill purchased an ailing company that continued to accumulate hundreds of thousands of dollars in fines following the merger:

> To date, Great Hill has discovered that credit card association(s), card-issuing bank(s), other credit card issuer(s) or third-party payment processor(s) have assessed fines, penalties or similar assessments resulting from violating applicable credit card association policies,

---

[168] *Id.*

[169] *Id.*; *see also id.* ¶ 17(b) ("SIG (through Goldman and Klahr), Herzog & Kleinberg concealed from Great Hill that additional side payments to Tal would work to offset the equity commitment that Tal was making to Great Hill, thereby misleading Great Hill into believing that Tal was committed to, and had a large stake in, the post-merger company.").

39

procedures, guidelines or rules with respect to excessive chargebacks or similar recurring payments, as described in this complaint, during the period between the [Amended Merger] Agreement Effective Date and the one year anniversary of the closing Date, totaling approximately $788,000.[170]

The Plaintiffs argue that certain Defendants agreed to indemnify the Plaintiffs for these costs under the terms of the Amended Merger Agreement. Under the terms of that Agreement, certain "Effective Time Holders" are obligated to indemnify Fremont, Plimus (as the surviving corporation), their affiliates and other indemnified parties against losses in connection with, among other things, breaches of representations or warranties of the Company.[171] The Agreement defines "Effective Time Holders" as:

> collectively, (i) each holder of Company Capital Stock as of immediately prior to the Effective Time that does not perfect such holder's appraisal rights under the CGCL, and (ii) each holder of a Qualifying Company Option; provided, that, solely for purposes of Sections 5.06(a), 5.06(b), 5.06(c) of this Agreement, only Persons that are included in the preceding clause (i) of this definition shall be deemed to be Effective Time Holders.[172]

The Plaintiffs contend that Moving Defendants SIG Fund, Tal, Segal Itshayek, Herzog, Kleinberg, Donors Capital, and Kids Connect qualify as Effective Time

---

[170] *Id.* ¶ 227.

[171] Am. Compl. ¶ 225.

[172] Am. Merger Agreement at 7. *But see* Original Merger Agreement at 7 (providing that the Delaware General Corporation Law shall govern appraisal rights, instead of the California General Corporation Law). "Effective Time" is defined under the Agreement as 'the later of (i) the date of the filing of the Certificates of Merger with the Secretary of State of the State of Delaware and the Secretary of State of the State of California, and (ii) the date set forth in the Certificates of Merger." Am. Merger Agreement § 2.04.

40

Holders according to this definition.[173]  Consequently, the Plaintiffs argue, these Defendants are liable for the post-merger fines, penalties, and assessments, according to the indemnification and representations and warranties provisions of the Amended Merger Agreement.

1. Indemnification

Section 10.02(a) of the Amended Merger Agreement contains an indemnification provision, whereby:

> Subject to the terms of this Article 10, after the Effective Time, each Effective Time Holder, individually as to himself, herself or itself only and not jointly as to or with any other Effective Time Holder, shall indemnify [Fremont] and the Surviving Corporation and each of their respective Subsidiaries and Affiliates, and each of their respective directors, officers, managers, members, partners, stockholders, subsidiaries, employees, successors, heirs, assigns, agents and representatives (each a "Parent Indemnified Person") against such Effective Time Holder's Pro Rata Share of any actual loss, liability, damage, obligation, cost, deficiency, Tax, penalty, fine or expense, whether or not arising out of third party claims (including interest, penalties, reasonable legal fees and expenses, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing) . . . which such Parent Indemnified Person suffers, sustains or becomes subject to, as a result of, in connection with or relating to: (i) any breach by [Plimus] of any representation or warranty of [Plimus] set forth herein, in any Disclosure Schedule or in the Company Closing Certificate; (ii) any breach by [Plimus] of any of the covenants or agreements of [Plimus] set forth herein to be performed on or before the Effective Time or any breach by such Effective Time Holder of any of the covenants or agreements of such Effective Time Holder set forth herein to be performed after the Effective Time; or (iii) any fines, penalties or similar assessments imposed against [Plimus] or any of its Subsidiaries for violating

---

[173] Am. Compl. ¶ 34.

41

applicable credit card association policies, procedures, guidelines or rules with respect to excessive chargebacks or similar recurring payments during the period between the Agreement Effective Date and the one year anniversary of the Closing Date, by a credit card association, card-issuing bank, other credit card issuer or third-party payment processor with respect to, and only to the extent of, transactions occurring prior to the Closing Date. . . .[174]

Among other limitations outlined in the Amended Merger Agreement, Section 10.03(b) provides that "[t]he Escrow Amount will be the sole source of funds from which to satisfy the Effective Time Holders' indemnification obligations" that arise under Section 10.02(a)(i) for representations and warranties.[175] Section 10.03(c), however, provides that, for claims not subject to the cap, such payments

shall first be made to the extent possible from the Escrow Account and thereafter shall be made directly by an Effective Time Holder individually as to himself, herself or itself only and not jointly as to or with any other Effective Holder, based on such Effective Time Holder's Pro Rata Share of the applicable Loss.[176]

The Escrow Account established under the Agreement holds $9.2 million.[177]

## 2. Representations and Warranties

The Amended Merger Agreement contained several representations and warranties that relate to Plimus's relationships with payment processors and card associations and thus are relevant here. Four such relevant provisions, and the Plaintiffs' related arguments, are described below.

---

[174] Am. Merger Agreement § 10.02(a).
[175] *Id.* § 10.03(b).
[176] *Id.* § 10.03(c).
[177] *Id.* at 8.

First, Section 3.09(c) of the Amended Merger Agreement represents that:

> Neither [Plimus] nor any of its Subsidiaries, taken as a whole, have any material liabilities or obligations . . . except for (i) liabilities that are expressly reflected or reserved against on the liabilities side of the Most Recent Balance Sheet, (ii) liabilities under the Contracts and the Employee Benefit Plans set forth in Section 3.16 and 3.19 of the Disclosure Schedule or under Contracts entered into in the Ordinary Course of Business which are not required to be disclosed in Section 3.16 of the Disclosure Schedule due to specified dollar thresholds or other limitations (but not liabilities for breaches thereof), (iii) liabilities set forth in Section 3.09(c) of the Disclosure Schedule, (iv) liabilities which have arisen in the Ordinary Course of Business since the date of the Most Recent Balance Sheet (none of which is a liability for breach of contract, breach of warranty, tort or infringement or a claim or lawsuit or an environmental liability), and (v) liabilities under this Agreement, the Other Transaction Documents and the Transactions.[178]

The Plaintiffs argue that Tal, Segal Itshayek, SIG, Klahr, Goldman, Herzog and Kleinberg caused Plimus to breach this representation because they "never disclosed that Plimus was facing material fines, fees, and penalties as a result of the June 2011 BRAM Violation, August 2011 BRAM/Aggregation Violation, and recurring excessive chargeback ratios," and because they "never disclosed Plimus's materially reduced revenues and profits and liabilities resulting from the need to eliminate numerous clients because of Plimus's violations of the credit card association rules and regulations and the risk of termination of its processor relationships."[179]

---

[178] *Id.* § 3.09(c).
[179] Am. Compl. ¶ 15(a).

Further, the Plaintiffs allege that the Defendants' fraud caused Plimus to breach the representation in Section 3.16, which provides, in relevant part, that:

> Neither [Plimus] nor any Subsidiary of [Plimus], nor, to [Plimus's] Knowledge, any of the other parties thereto, is in default in complying with any material provisions [of the Contracts required to be disclosed in Section 3.16 of the Disclosure Schedule], nor has [Plimus] or any of its Subsidiaries received written notice of any such default, and, to the Knowledge of [Plimus], no condition or event or facts exist which, with notice, lapse of time or both, would constitute a default thereof on the part of [Plimus] or such Subsidiary of [Plimus]. There is no material dispute under any Contract required to be disclosed in Section 3.16 of the Disclosure Schedule.[180]

The Plaintiffs contend that Tal, Segal Itshayek, SIG, Klahr, Goldman, Herzog and Kleinberg "caused Plimus to represent and warrant falsely in Section 3.16 of the Merger Agreement that Plimus was in compliance with its contracts," even though, "Plimus was in fact in default of material provisions in its contracts with PayPal."[181]

> Thirdly, Plimus further represented in Section 3.23, in relevant part, that:

> [Plimus] and each of its Subsidiaries is and has been in compliance with the bylaws and operating rules of any Card System(s), the Payment Card Industry Standard (including the Payment Card Industry Data Security Standard), the operating rules of the National Automated Clearing House Association, the applicable regulations of the credit card industry and its member banks regarding the collection, storage, processing, and disposal of credit card data, and any other industry or association rules applicable to [Plimus] or any of its Subsidiaries in connection with their respective operations.[182]

---

[180] Am. Merger Agreement § 3.16.
[181] Am. Compl. ¶ 15(b).
[182] Am. Merger Agreement § 3.23.

44

According to the Amended Complaint, Tal, Segal Itshayek, SIG, Klahr, Goldman, Herzog and Kleinberg "caused Plimus to represent and warrant falsely in Section 3.23 . . . that Plimus was in compliance with credit card rules and regulations," when, in fact, because of Plimus's BRAM violations and excessive chargebacks, "Plimus was not in compliance with the applicable operating rules of PayPal, MasterCard, and/or other payment processors and credit card associations."[183]

> Lastly, Plimus represented in Section 3.26(b) that:
>
> There are no suppliers of products or services to [Plimus] or any of its Subsidiaries that are material to its business with respect to which alternatives sources of supply are not generally available on comparable terms and conditions in the marketplace. No supplier of products or services to [Plimus] or any of its Subsidiaries has notified [Plimus] or such Subsidiary that it intends to terminate its business relationship with [Plimus] or such Subsidiary.[184]

In connection with this representation, Plimus "disclose[d] that PayPal provided services to the company that were 'material to the company's business' and that 'alternative sources of supply are not generally available on comparable terms and conditions.'"[185] The Plaintiffs allege that the Company's representation in Section 3.26(b) was false because "PayPal had notified Plimus that it intended to terminate its business relationship with the company," a fact that was concealed from Great

---

[183] Am. Compl. ¶ 15(c).
[184] Am. Merger Agreement § 3.26(b).
[185] Am. Compl. ¶ 111.

Hill.[186]   According to the Amended Complaint, Tal, Segal Itshayek, SIG, Klahr, Goldman, Herzog and Kleinberg caused Plimus to make this false representation in the Agreement.[187]

Plimus disclosed exceptions to these representations and warranties in an accompanying schedule.[188]   In the Disclosure Schedule to the Original Merger Agreement, Plimus did not disclose the June 2011 BRAM Violation despite its alleged impact on the representation and warranties in Sections 3.09(c), 3.16, and 3.23.[189]   In connection with the Amended Merger Agreement, Plimus provided a Supplemental Disclosure Schedule.   The Plaintiffs allege that this Supplemental Disclosure Schedule further "failed to disclose the imminent termination of the PayPal relationship (and, again, did not disclose either the June 2011 BRAM Violation or the August 2011 BRAM/Aggregation Violation), and did not otherwise qualify the Merger Agreement's representations and warranties to account for these facts."[190]

## II. PROCEDURAL HISTORY

On September 27, 2012, Great Hill Equity Partners IV, LP, Great Hill Investors LLC, Fremont Holdco, Inc., and BlueSnap, Inc. (F/K/A Plimus)

---

[186] *Id.* ¶ 15(d).
[187] *See id.*
[188] *Id.* ¶ 112.
[189] *Id.* ¶ 113.
[190] *Id.* ¶ 148.

46

(collectively, the "Plaintiffs"), filed their Verified Complaint against the Defendants in this action, SIG Growth Equity Fund I, LLLP, SIG Growth Equity Management LLC, Amir Goldman, Jonathan Klahr, Hagai Tal, Tomer Herzog, Daniel Kleinberg, Irit Segal Itshayek, Donors Capital Fund, Inc., and Kids Connect Charitable Fund (the "Defendants").

In September 2012, approximately one year after the merger, the Plaintiffs notified the Defendants that, "among the files on the Plimus computer systems that the Buyer acquired in the merger, it had discovered certain communications between the Seller and Plimus's then-legal counsel at Perkins Coie regarding the transaction."[191] The Amended Merger Agreement did not provide that pre-merger attorney-client communications were excluded in the assets transferred to the Plaintiffs.[192] When the Plaintiffs notified the Defendants, however, the Defendants "asserted the attorney-client privilege over those communications on the ground that it, and not the surviving corporation, retained control of the attorney-client privilege that belonged to Plimus for communications regarding the negotiation of the merger agreement."[193] Then-Chancellor Strine characterized the question at issue as one "of statutory interpretation in the first instance," noting that

---

[191] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLP*, 80 A.3d 155, 156 (Del. Ch. 2013).
[192] *Id.*
[193] *Id.*

Section 259 of the DGCL provides that following a merger, "all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation . . . ." [194]

The Court reasoned that "[i]f the General Assembly had intended to exclude the attorney-client privilege, it could easily have said so. Instead, the statute uses the broadest possible language to set a clear and unambiguous default rule: *all privileges* of the constituent corporation pass to the surviving corporation in a merger."[195] Thus, the privilege relating to pre-merger communications between Perkins Coie and the Defendants passed to the surviving entity following the merger. This meant that the Plaintiffs had access to these privileged documents in drafting their Amended Complaint. Such access, however, does not change the standards of review, which are discussed below.[196]

The Plaintiffs filed their Verified Amended Complaint on April 7, 2014, which includes the following: Count I alleges fraudulent inducement against Tal, Segal Itshayek, Goldman and Klahr; Count II alleges fraud against Tal, Segal Itshayek, Goldman and Klahr; Count III alleges aiding and abetting against SIG

---

[194] *Id.*

[195] *Id.* at 159.

[196] This Court's decision in *Trenwick*, despite the Moving Defendants' assertion to the contrary, does not suggest that a plaintiff with greater access to information is subject to a higher pleading standard than that provided by Rule 9(b). *See* Mem. of Law in Supp. of Mot. to Dismiss at 26–27. Rather, *Trenwick* provided that the standard required by Rule 9(b) would not be lowered in that case, particularly where the plaintiff had, in the Court's view, "far more access to information than the typical plaintiff." *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 212 (Del. Ch. 2006) *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007).

Fund, SIG Management, Goldman, Klahr, Herzog, and Kleinberg; Count IV alleges civil conspiracy against Tal, Segal Itshayek, SIG Fund, SIG Management, Goldman, Klahr, Herzog and Kleinberg; Count V is a Count for indemnification against the Effective Time Holders and SIG Management; Count VI alleges unjust enrichment against all of the Defendants; and Count VII is a Count for a declaratory judgment. The Plaintiffs seek, among other relief, indemnification, damages, and rescission of the merger. On May 27, 2014, Defendants SIG Fund, SIG Management, Goldman, Klahr, Herzog, Kleinberg, Donors Capital and Kids Connect (the "Moving Defendants") moved to dismiss Counts I-IV, VI and VII of the Amended Complaint, as well as the requested recession remedy, and to limit the indemnification remedy sought under Count V.

I heard oral argument on the Moving Defendants' Motion to Dismiss on August 13, 2014. For the reasons below, the Moving Defendants' Motion is granted in part and denied in part.

## III. STANDARD OF REVIEW

The Moving Defendants have moved to dismiss pursuant to Court of Chancery Rule 12(b)(6). When addressing such a Motion, I must accept all well-pled facts as true and draw all reasonable inferences in favor of the plaintiff.[197]

---

[197] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

Such a motion will be denied "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[198]

This Court imposes a heightened pleading standard to claims of fraud. Court of Chancery Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[199] To satisfy this heightened pleading standard, "a complaint for fraud must include the time, place, contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby."[200] "Essentially, the plaintiff is required to allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim."[201] Knowledge, however, "may be averred generally."[202] But, "where pleading a claim of fraud . . . that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it."[203]

---

[198] *Id.*; *see also In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *7 (Del. Ch. July 24, 2014).

[199] Ct. Ch. R. 9(b).

[200] *Ruffalo v. Transtech Serv. Partners Inc.*, 2010 WL 3307487, at *16 (Del. Ch. Aug. 23, 2010) (internal quotation marks omitted).

[201] *ABRY Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[202] Ct. Ch. R. 9(b).

[203] *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005); *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998).

## IV. ANALYSIS

### A. Fraud Counts

In addition to the fraud claims against Tal and Segal Itshayek—which are not the subject of the Motion to Dismiss and the sufficiency of which at this pleading stage is uncontested—the Plaintiffs have also alleged fraud and fraudulent inducement against Goldman and Klahr, in connection with the fraudulent acts of Tal and Segal Itshayek, as well as civil conspiracy and aiding and abetting fraud against Goldman, Klahr, Herzog, Kleinberg (the "Director Defendants") and SIG.

To briefly reiterate the basis for the direct and secondary fraud claims at issue, the Plaintiffs allege three distinct sets of circumstances that involved fraudulent actions taken largely by Tal and Segal Itshayek. First, relating to Paymentech, it is alleged that Goldman and Klahr, as well as Tal and Segal Itshayek, concealed the true reason for the termination of that relationship—that Plimus had breached agreements and had violated credit card association rules, both of which "signaled core issues" with Plimus—and allowed Tal to rewrite the disclosure relating to Paymentech in such a way as to mislead the Plaintiffs into thinking that Plimus had instigated the termination of the Paymentech relationship.[204] As to PayPal, the Plaintiffs allege that Goldman and Klahr, as well as Tal and Segal Itshayek, concealed from the Plaintiffs the MasterCard BRAM

---

[204] Am. Compl. ¶ 5(a).

51

and Aggregation Violations, as well as excessive chargeback ratios, which ultimately led PayPal to terminate its relationship with Plimus[205] and affected subsequent payment processor relationships.[206] The Plaintiffs also allege that Goldman and Klahr concealed a "deceptive and fraudulent three-pronged strategy" undertaken by Tal that prevented the Plaintiffs from discovering the fraudulent activities described above, by "attempt[ing] to hold the company's payment processors at bay—ultimately to no avail—all while Plimus's management fraudulently maintained the appearance of Plimus's revenues and profits . . . ."[207] Finally, as to the Side Letter, the Plaintiffs allege that Goldman, Klahr, SIG, Herzog and Kleinberg made extra-contractual "black-mail" payments to Tal to encourage him to roll-over equity into the new company post-merger and avoid raising any red flags as to Tal's confidence in the continuing entity, an effort which misled and caused damage to the Plaintiffs.[208]

In Counts I and II, the Amended Complaint pleads direct fraud on the part of Goldman and Klahr for their involvement, along with Tal and Segal Itshayek, in the allegations outlined above. The Plaintiffs also allege that Goldman and Klahr conspired to commit the same acts of fraud and aided and abetted these fraudulent

---

[205] *See, e.g., id.* ¶ 5(b)–(c).
[206] *See, e.g., id.* ¶ 16(b).
[207] *Id.* ¶ 14.
[208] *See, e.g., id.* ¶ 68. Despite the allegations against Herzog and Kleinberg, the Plaintiffs seek to hold them liable for conspiracy and/or aiding and abetting, not fraud.

acts, in Counts III and IV of the Amended Complaint. Because the facts underlying the direct and secondary fraud Counts with respect to Goldman and Klahr are the same and any damages would be the same,[209] recovery is only appropriate under *either* a direct fraud theory *or* a theory of secondary participation in the fraud. There is no utility in requiring the Plaintiffs to choose which theory to pursue at this stage in the litigation, however. Accordingly, for the same reasons, discussed below, that I am denying the Motion to Dismiss Counts III and IV as to Goldman and Klahr, I also decline to dismiss Counts I and II at this stage.[210]

### 1. Civil Conspiracy

The Plaintiffs have alleged that the Director Defendants and SIG, along with Tal and Segal Itshayek "knowingly entered into a confederation or combination to fraudulently induce Great Hill" to enter into the Letter Agreement, the Original Merger Agreement, and the Amended Merger Agreement, and to close the

---

[209] *See, e.g., Nicolet, Inc. v. Nutt*, 525 A.2d 146, 150 (Del. 1987) ("Under Delaware law, a conspirator is jointly and severally liable for the acts of co-conspirators committed in furtherance of the conspiracy.")

[210] The Moving Defendants challenged the fraud claims against Goldman and Klahr alleging a failure to plead facts supporting an inference of their knowledge. I find that it is sufficiently pled that, as SIG's designees on the Plimus board, Goldman and Klahr had an interest in the merger and the ability, together with the other directors, to control Tal, the Company's CEO. The Amended Complaint also adequately alleges that these directors were aware of the proposed, accurate Paymentech disclosure, as well as the allegedly fraudulent disclosure as altered by Tal. As directors, it is conceivable that Goldman and Klahr were aware that those same problems also doomed the PayPal relationship. These allegations are sufficient to withstand the Moving Defendants' 12(b)(6) challenge, in light of the fact that Rule 9(b) does not apply its specificity requirement to averments of knowledge.

merger.[211] "The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties."[212] "Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to 'be pled with particularity.'"[213] Knowledge, however, may be averred generally; all that is required to show that a defendant knew something are "sufficient well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it."[214] The purpose of the particularity requirement is to consider whether "[a] reading of the Complaint as a whole . . . gives the defendants adequate notice of the basis of their alleged wrongdoing."[215]

Here, the unlawful acts were the misleading of Great Hill concerning the true nature of the Paymentech termination and the impending PayPal termination, as well as the fraudulent Side Letter payment to Tal. At least with respect to Tal and Segal Itshayek, the adequacy of the fraud pleading is unchallenged, and I find

---

[211] Am. Compl. ¶ 212 (emphasis added).

[212] *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *10 (Del. Ch. Aug. 26, 2005).

[213] *Id.* at *11.

[214] *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998).

[215] *Norman v. Paco Pharm. Servs., Inc.*, 1989 WL 110648, at *10 (Del. Ch. Sept. 22, 1989).

it sufficient here under Rule 9(b). Additionally, the Plaintiffs have adequately alleged damages. The remaining element, a confederation or combination between the Director Defendants, SIG, and the fraudsters is the only element that remains for the Moving Defendants to challenge here. The existence of a confederation may be pled by inference; it is not subject to the specificity requirement of Rule 9(b).[216] This element is analyzed below.

The Moving Defendants suggest that the Plaintiffs have failed to adequately allege a confederation to advance the fraud because they have failed to plead "knowing participation."[217] But the Plaintiffs are only required to allege well-pleaded facts from which I can infer that the alleged fraud "was knowable" and that the Director Defendants and SIG were "in a position to know it."[218]

The Amended Complaint adequately alleges that Goldman and Klahr reviewed the proposed, accurate Paymentech disclosure, as well as the allegedly fraudulent disclosure as altered by Tal. Herzog and Kleinberg are alleged to have "sought and obtained access to the materials in the data room," in which the fraudulent disclosure was displayed to Great Hill, and to have participated in the

---

[216] *See, e.g.*, *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009) *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) ("[A] conspiracy can be inferred from the pled behavior of the alleged conspirators.")

[217] Reply Mem. of Law in Supp. of Mot. to Dismiss at 29 (citation omitted).

[218] *See Iotex*, 1998 WL 914265, at *4.

sales process.[219]  They also, as Plaintiffs pled, were told by Tal that "*Paymentech are closing our account*,"[220] from which they could then know that the data room representation that alleged a mutual termination of the Paymentech relationship was false.[221]

According to the Plaintiffs, these four directors' involvement in the sales process supports an inference that they "were aware of the catastrophic problems with PayPal and of Plimus's deeply misleading disclosures."[222]  Further, as directors, it strikes me as unlikely that they were unaware of the impending and allegedly catastrophic loss of the relationship with PayPal.  Taking all reasonable inferences in the Plaintiffs' favor, I agree that these pleadings adequately allege facts from which I may infer knowing participation in the underlying wrong by Goldman, Klahr, Herzog, and Kleinberg, so as to meet the minimal requirements to survive a motion under Rule 12(b)(6).

---

[219] Am. Compl. ¶ 42; *see also id*. ¶ 80 (alleging that Herzog and Kleinberg received, from Klahr, the March 18 letter to Paymentech from Perkins Coie that represented the termination as "unilateral" and noted the "substantial detrimental effect" the termination would have and that "at least Klahr, Herzog, and Kleinberg spoke by telephone on March 22 [the day that Klahr emailed the correspondence to Herzog and Kleinberg] regarding Paymentech's termination of the Plimus relationship").

[220] *See id*. ¶ 42(a) (emphasis added).

[221] *See id*. ¶ 83 (representing that the termination was mutual upon an unwillingness by Paymentech to renegotiate certain terms of the parties' contract).

[222] Answering Br. in Opp'n to Moving Defs.' Mot. to Dismiss at 41.

As to knowledge on the part of SIG Fund and SIG Management, it is reasonable to infer at the pleading stage that Goldman and Klahr, two principals of SIG, had knowledge that was imputed to these entities under Delaware law.[223]

Given the finding above, I determine that the Plaintiffs have adequately pled that a confederation or agreement to further the underlying wrong existed among the Moving Defendants and Tal and Segal Itshayek. I can infer that Herzog and Kleinberg, together with Goldman and Klahr, as Plimus directors, collectively had control over the Company's CEO, the apparent ringleader of the alleged fraud relating to payment processors. As large blockholders within the Company,[224] they also had a financial motive not to exercise that control to stop him. Since I infer, as found above, that the Director Defendants and SIG had knowledge of Tal's fraud, it is also reasonable to infer that there was at least a tacit agreement among them to perpetrate that fraud.

In fact, the Amended Complaint alleges that each of the Director Defendants and SIG "committed unlawful acts in furtherance of the conspiracy, including making or causing to be made false representations and concealing material facts that they had a duty to disclose."[225] Most of these alleged misrepresentations or

---

[223] *ABRY Partners V, L.P. v. F & W Acquisition LLP*, 891 A.2d 1032, 1051 n.35.

[224] Collectively, Kleinberg and Herzog owned 44% of the Company's outstanding stock. Goldman and Klahr were principals of SIG Fund, which was a major stockholder of the Company.

[225] Am. Compl. ¶ 217.

concealments involve Tal, Segal Itshayek, Goldman, and Klahr alone.[226] But on the part of SIG Fund, SIG Management, Herzog, and Kleinberg, the Plaintiffs allege that each concealed the unilateral termination by Paymentech "due to, among other things, Plimus's repeated violations of credit card association rules" and concealed that the extra-contractual payment to Tal was made to offset his equity commitment, which "misl[ed] Great Hill into believing that Tal was committed to, and had a large stake in, the post-merger company."[227] These concealments furthered the fraud, it is alleged, because had the Plaintiffs known the truth, they would not have entered into the Merger Agreement for $115 million.

Upon drawing all inferences in Plaintiffs' favor, as is appropriate at this stage, I find that they have pled sufficient facts to withstand the present Motion as it relates to the civil conspiracy claims.

### 2. Aiding and Abetting

As noted, civil conspiracy and aiding and abetting are quite similar. Indeed, this Court has noted that civil conspiracy claims are "sometimes called aiding and abetting."[228] These two causes of action have been characterized as "concerted action by agreement," (conspiracy) and "concerted action by substantial

---

[226] *See id.* ¶ 217(B)–(I).

[227] *Id.* ¶ 217(A), (J).

[228] *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *10 (Del. Ch. Aug. 26, 2005) ("While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. Claims for civil conspiracy are sometimes called aiding and abetting.")

assistance" (aiding and abetting).[229] From this characterization, it seems likely to me that civil conspiracy is, in many cases, to borrow a term, a "lesser-included" claim within an aiding and abetting claim; an "agreement" and act in furtherance does not necessarily rise to the level of "*substantial* assistance," while "substantial assistance," if shown, normally includes an "agreement," even if implicit, and act in furtherance thereof.[230]

The similarity of aiding and abetting a breach of fiduciary duty and civil conspiracy has not gone unobserved by this Court, which has noted that

> a court ultimately might find after trial that "any relief granted for the civil conspiracy claims . . . would be redundant of the relief for aiding and abetting [a breach of fiduciary duty]," and, on that basis, decline to consider one claim or the other. Yet, despite their similarities, the claims are different: "[a]iding and abetting is a cause of action that focuses on the wrongful act of providing assistance, unlike civil conspiracy that focuses on the agreement.[231]

It is not clear to me that—in the fraud context here, to be distinguished from the breach of fiduciary duty context applicable in the quotation above—a litigant would be likely to show aiding and abetting without incidentally having shown the elements of civil conspiracy were satisfied. This suggests that the aiding and abetting fraud claim may be duplicative of the civil conspiracy count. I also note,

---

[229] *Anderson*, 2004 WL 2827887, at *2.

[230] While I note the duplicity of these causes of action, the Moving Defendants actually argued that the civil conspiracy claim was duplicative of the aiding and abetting claim, not the other way around, as I contemplate.

[231] *Hospitalists of Delaware, LLC v. Lutz*, 2012 WL 3679219, at *15 (Del. Ch. Aug. 28, 2012) (alterations in original) (footnotes omitted).

however, that dismissing the aiding and abetting claim will confer no benefit in terms of litigants' economy, since the underlying tort is the same, and the evidence that will show agreement and assistance will require similar discovery. In that regard, there is little utility at this stage in dismissing the aiding and abetting claim as redundant of civil conspiracy, although motion practice on a more developed record may well lead to this result. In this light, I examine the allegations of aiding and abetting below.[232]

Delaware courts have set out the elements for aiding and abetting a tort as: (i) underlying tortious conduct, (ii) knowledge, and (iii) substantial assistance.[233] The underlying tortious conduct here is the fraud, pled in Counts I and II of the Amended Complaint, and uncontested at this stage with respect to Tal and Segal Itshayek.

---

[232] *See id.* (declining to dismiss similar counts on grounds that it was "conceivable" for purposes of a motion to dismiss that evidence could support one or the other, but not both, claims).

[233] *Anderson,* 2004 WL 2827887, at *4; *see also Patton v. Simone*, 1992 WL 183064, at *8 (Del. Super. June 25, 1992) (citing the Restatement (Second) of Torts). *But see In re Rural/Metro Corp. Stockholders Litig.*, 2014 WL 5280894, at *7 n.1 (Del. Ch. Oct. 10, 2014) (citing the Restatement (Second) of Torts but noting that "[a]s a caveat, it is not clear that the Restatements apply directly to the facts of this case," because, in part, "[t]he Restatement (Second) generally applies to torts involving injury to persons and tangible property, but it also contains sections on negligent misrepresentation and fraud, which frequently result in economic loss alone, as well as sections addressing harm to intangible property interests, like a person's reputation, which do not involve physical harm" and concluding that "the Restatements are at least persuasive authority on the questions presented").

Logically, in the tort as opposed to the breach of fiduciary duty context, damages must be a necessary element of aiding and abetting as well. Since damages are adequately pled here, I need not address this factor further.

As to the knowledge element, I find that the Amended Complaint states with the requisite particularity that Goldman, Klahr, Herzog, Kleinberg, and SIG knew of the fraud carried out by Tal and Segal Itshayek with respect to Paymentech, PayPal, and the Side Letter, for the reasons outlined above in connection with the civil conspiracy claim. I thus turn to the remaining element, substantial assistance.

The Plaintiffs pled substantial assistance on the part of Goldman and Klahr in that they allowed Tal and Segal Itshayek to conceal the truth regarding Paymentech and PayPal and encouraged them to close the merger even though it had been procured through fraud.[234] Additionally, the Plaintiffs allege that Goldman, Klahr, Herzog, Kleinberg and SIG's role in the Side Letter payments to Tal to rollover his equity show substantial assistance. While the Moving Defendants cite a number of cases holding that inaction, without more, does not constitute substantial assistance, the Plaintiffs are not relying on such a theory— rather, they are alleging that the "black-mail" payment to Tal consisted of substantial assistance in that it encouraged him to rollover his equity, "conceal[ing] Tal's concerns about the future of the company."[235] The Plaintiffs quote an email from SIG to Plimus's counsel, stating that the "side letter (the extra 30%) was contingent on [Tal] agreeing to roll $3m. The founders [Herzog and Kleinberg]

---

[234] *See, e.g.,* Am. Compl. ¶ 206.
[235] *Id.* ¶ 68.

also take the same position."[236] The Plaintiffs also pled that Tal emailed Kleinberg and Herzog that he had "limited interest in this deal" without the side payments and, in attempting to obtain additional payments, wrote "I also have to commit for 18 month [sic] and more so deal will take place."[237] The Amended Complaint alleges that the Side Letter payment was designed to and did conceal Tal's lack of confidence in his positive—and false—representations concerning the future of Plimus.

Having drawn all reasonable inferences from the pleadings in Plaintiffs' favor and concluding that it is reasonably conceivable that the Director Defendants and SIG knew of the fraud, I similarly find that it is reasonably conceivable that they agreed to the "black-mail" payment to Tal to minimize suspicion on the part of Great Hill and close the deal in spite of the Paymentech misrepresentations.[238] I emphasize again that this is not the only, and perhaps not the strongest, conclusion to be drawn from the pleadings, but it is not beyond the bounds of reasonable conceivability at the motion to dismiss stage.

The Moving Defendants argue that "collateral agreements can only serve as the basis for aiding and abetting claims where they are 'so grossly excessive' as to

---

[236] *Id.*

[237] *Id.* ¶ 69 (internal quotation marks omitted).

[238] I note the Moving Defendants contention that the side deal was negotiated before the PayPal issues arose. *See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 46. However, the Paymentech issues had occurred. *See, e.g.,* Am. Compl. ¶¶ 7, 72–80.

be 'inherently wrongful,'" relying on this Court's decision in *McGowan*;[239] that reliance, in my opinion, is misplaced. The allegation in *McGowan* that this Court found wanting was that an acquiring company had made side payments to certain directors to induce them to breach their fiduciary duties. The Court in *McGowan* was considering whether it could infer knowing participation when confronted with a complaint that did not plainly allege a conspiracy to breach fiduciary duties; thus, the Court had to look for a breach of duty sufficiently flagrant to imply knowledge on the part of the abetter.[240] Here, for the reasons set out above, facts from which I can infer knowing participation in the alleged fraud on the part of the Director Defendants have been adequately pled.

As to SIG Management, the Stockholders' Representative, and SIG Fund, a major stockholder, the Defendants argue that "[s]imply agreeing to merger terms does not amount to substantial assistance in fraud."[241] However, as discussed, the Plaintiffs have pled that much of the email correspondence with Tal regarding the Side Letter was on behalf of SIG.[242] The Plaintiffs are not suggesting that SIG's only role was agreeing to the merger terms. It is reasonably conceivable that SIG's involvement, through Goldman and Klahr, amounted to substantial assistance.

---

[239] *McGowan v. Ferro*, 2002 WL 77712, at *3 (Del. Ch. Jan. 11, 2002) (footnotes omitted).
[240] *Id.* at *2.
[241] Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 46.
[242] *See* Am. Compl. ¶¶ 66, 67 ("SIG, through Goldman . . . ."; "SIG, through Klahr . . . .").

Finally, with respect to the contention that the either the aiding and abetting claim or the conspiracy claim should be dismissed as duplicative, I note that it is conceivable that, at least with respect to the Side Letter, there was not a tacit agreement to pay off Tal, which is required to support a conspiracy claim, but instead financial motivation on the part of Goldman, Klahr, Herzog, and Kleinberg to further Tal's fraud for reasons of their own; thus, the payment could have been made without an agreement, conceivably supporting an aiding and abetting claim without satisfying the requisites of conspiracy.

For the reasons above, I decline to dismiss Counts III and IV.

*B. Remaining Counts*

The Moving Defendants seek to limit the scope of the indemnification remedy sought by the Plaintiffs and to dismiss the Plaintiffs' allegations that the Moving Defendants were unjustly enriched and that the Plaintiffs are entitled to a declaratory judgment or rescission. These arguments are addressed below.

1. <u>Indemnification</u>

The Plaintiffs, in Count V of their Amended Complaint, seek indemnification from the Effective Time Holders—SIG Fund, Tal, Segal Itshayek, Herzog, Kleinberg, Donors Capital, and Kids Connect—as well as SIG Management pursuant to Sections 10.02(a)(i) and (iii). Pursuant to Section 10.02(a)(i), the Plaintiffs argue that Plimus was caused by Segal Itshayek, SIG,

Klahr, Goldman, Herzog and Kleinberg to breach the representations and warranties in Sections 3.09(c), 3.16, 3.23, and 3.26(b), resulting in losses which the Effective Time Holders must indemnify. In addition, pursuant to Section 10.02(a)(iii), the Plaintiffs argue that the Effective Time Holders are responsible for the approximately $788,000 in fines levied against Plimus during this applicable contractual period.[243] The latter amount, while subject to proof at a later stage of the litigation, is not at issue in this motion.

The indemnification provision provides:

> Subject to the terms of this Article 10, after the Effective Time, each Effective Time Holder, *individually as to himself, herself or itself only and not jointly as to or with any other Effective Time Holder*, shall indemnify [Fremont Holdco, Inc.] and the Surviving Corporation and each of their respective Subsidiaries and Affiliates, and each of their respective directors, officers, managers, members, partners, stockholders, subsidiaries, employees, successors, heirs, assigns, agents and representatives (each a "Parent Indemnified Person") against such Effective Time Holder's Pro Rata Share of any actual loss, liability, damage, obligation, cost, deficiency, Tax, penalty, fine or expense, whether or not arising out of third party claims (including interest, penalties, reasonable legal fees and expenses, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing) . . . which such Parent Indemnified Person suffers, sustains or becomes subject to, as a result of, in connection with or relating to: (i) any breach by [Plimus] of any representation or warranty of [Plimus] set forth herein, in any Disclosure Schedule or in the Company Closing Certificate; (ii) any breach by [Plimus] of any of the covenants or agreements of [Plimus] set forth herein to be performed on or before the Effective Time or any breach by such Effective Time Holder of any of the covenants or agreements of such Effective Time Holder set forth herein to be performed after the

---

[243] Am. Compl. ¶ 227.

Effective Time; or (iii) any fines, penalties or similar assessments imposed against [Plimus] or any of its Subsidiaries for violating applicable credit card association policies, procedures, guidelines or rules with respect to excessive chargebacks or similar recurring payments during the period between the Agreement Effective Date and the one year anniversary of the Closing Date, by a credit card association, card-issuing bank, other credit card issuer or third-party payment processor with respect to, and only to the extent of, transactions occurring prior to the Closing Date. . . .[244]

There is no doubt that the Amended Complaint states a claim for indemnification. Hotly debated by the parties, however, is whether the parties intended the contractual limitation on indemnification to be operative in case of fraud. The Agreement is structured such that claims for indemnification in connection with representations and warranties—the contractual remedy offered for claims brought under Section 10.02(a)(i)—are subject to a $500,000 deductible and capped at $9.2 million, the amount in escrow.[245]

The Amended Merger Agreement also contains an "Exclusive Remedy" clause:

Following the closing, except (a) in the case of fraud or intentional misrepresentation (for which no limitations set forth herein shall be applicable) . . . the sole and exclusive remedies of the parties hereto for monetary damages arising out of, relating to or resulting from any

---

[244] Am. Merger Agreement § 10.02(a)(emphasis added).

[245] *Id.* § 10.03(c)(i), (ii); *see also id.* § 10.03(b). Although this cap is not applicable to claims brought under Section 10.02(a)(iii), claims brought under that Section are limited such that "in no event shall any Effective Time Holder's individual liability for Losses pursuant to Section 10.02(a)(iii) exceed such Effective Time Holder's Pro Rata Share of $5,000,000." *Id.* § 10.03(a)(iv). In their Amended Complaint, the Plaintiffs seek approximately $788,000 for damage due to fines and penalties from the Effective Time Holders pursuant to Section 10.02(a)(iii). Am. Compl. ¶ 227.

claim for breach of any covenant, agreement, representation or warranty set forth in this Agreement, the Disclosure Schedule or any certificate delivered by a party with respect hereto will be limited to those contained in this Article 10.[246]

Because the Exclusive Remedy clause excepts fraud and intentional misrepresentation from the limitations set forth in Article 10, and due to the fraudulent conduct allegedly perpetrated by Tal, Segal Itshayek, SIG, Klahr, Goldman, Herzog and Kleinberg, the Plaintiffs contend that "any purported limitation on the Effective Time Holders' indemnification obligations, including those set forth in Section 10.03 of the Merger Agreement, is inapplicable."[247] Instead, according to the Plaintiffs, because there was fraud, the Effective Time Holders are *jointly and severally* liable, and "must indemnify Great Hill for the full amount of its losses," not limited by the $9.2 million set aside in escrow.[248] The Moving Defendants argue that the only reasonable reading of Section 10 of the Merger Agreement is that the Plaintiffs may seek tort damages for fraud outside the limits of the indemnification provisions, but not unlimited indemnification from innocent Effective Time Holders. Although their contentions are brought as a

---

[246] *Id.* § 10.10.

[247] Am. Compl. ¶ 226.

[248] *Id.*; *see also* Answering Br. in Opp'n to Moving Defs.' Mot. to Dismiss at 51; Am. Compl. ¶ 17(c) ("Because the $9.2 million Escrow Amount available following the Merger would not be adequate to cover losses in the event that Great Hill was defrauded in the transaction, Great Hill bargained for and received the further protection from the Effective Time Holders that, in the event of fraud or intentional misrepresentation, or cases where injunctive or equitable relief were sought, Great Hill's remedies would *not* be limited to indemnification up to the $9.2 million Escrow Amount. Rather, under those circumstances, Great Hill is entitled, without limitation, to indemnification from the Effective Time Holders."); *id.* ¶ 110.

part of the Motion to Dismiss, the Moving Defendants do not seek dismissal of Count V. Instead, the Moving Defendants seek a ruling limiting the scope of the indemnification remedy sought here to funds in escrow, that is, under the cap.

The Effective Time Holders contracted to indemnify, pro rata to their ownership interests, for damages caused by breaches of contract, and only up to the amount provided in the Agreement. Looked at in context, the indemnification provision provides benefits to both buyers and sellers. For the purchasers, the provision provided them with a fund from which losses could be indemnified without a showing of fault on the part of the individual Effective Time Holders. For the stockholders, it provided a cap on contractual damages and limited their liability to a pro rata share; in other words, it provided certainty as to what their liability for losses from the sale of the Company would be. This cap on liability, and indemnification scheme in general, was specifically inapplicable to fraud, however. The Plaintiffs argue that the language at issue makes unlimited *indemnification* available in case of fraud, or at least that the language is ambiguous and can be read in that manner; the Moving Defendants ask me to rule as a matter of law that the language simply exempts from the indemnification limitations in Section 10 any recovery *in tort* from fraudsters.

Given the purposes described above, I tend to agree that the Moving Defendants' reading is commercially reasonable. I decline to address the language

68

here, however, because my decision would not dismiss Count V. Further, the Plaintiffs might never prove fraud, or, if they do, they might never prove damages exceeding the indemnification cap, rendering a decision here, in that case, merely advisory. In any event, an interpretation of the language at issue would be helpfully illuminated by evidence of the parties' intent. Without finding whether or not the language is ambiguous on its face, I decline to address the Moving Defendant's request for a ruling on the meaning of Section 10 as premature.

The discussion of the related question as to whether innocent Effective Time Holders may be liable for restitution follows.

### 2. Unjust Enrichment

The Plaintiffs allege that the Moving Defendants were unjustly enriched as a result of Great Hill being fraudulently induced to participate in the merger and acquire Plimus for $115 million, an "unfair and highly inflated purchase price" due to the fraud and breaches of representations and warranties that occurred.[249] The Plaintiffs thus seek restitution, in an amount to be determined at trial, so that they can be equitably and properly reimbursed of "all monies received by Defendants in excess of a true and fair valuation of Plimus at the time the Merger closed."[250]

"Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the

---

[249] *Id.* ¶ 235.
[250] *Id.* ¶¶ 236–37.

69

fundamental principles of justice or equity and good conscience."[251] It was developed "as a theory of recovery to remedy the absence of a formal contract."[252] To plead a claim for unjust enrichment, a plaintiff must plead "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[253] "Restitution serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance . . . ."[254] In other words, "[r]estitution is permitted even when the defendant retaining the benefit is not a wrongdoer."[255]

In evaluating unjust enrichment claims, Courts conduct a threshold inquiry "as to whether a contract already governs the parties' relationship."[256] "If a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied."[257] If the validity of that agreement is challenged, however, claims

---

[251] *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (internal quotation marks omitted).
[252] *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006).
[253] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).
[254] *Schock*, 732 A.2d at 232–33 (internal quotation marks omitted).
[255] *Id.*
[256] *Vichi v. Koninklijke Philips Electronics N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012).
[257] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009); *see also Bakerman*, 2006 WL 3927242, at *18 ("When the complaint alleges an express, enforceable contract that controls the parties' relationship, however, a claim for unjust enrichment will be dismissed."); *ID Biomedical Corp. v. TM Technologies, Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) ("It is undisputed the Letter Agreement governs the parties' relationship. This case is essentially a contract case accompanied by a request for

of unjust enrichment may survive a motion to dismiss.[258]   Further, this Court has recognized that, "[i]n some situations, . . . both a breach of contract and an unjust enrichment claim *may* survive a motion to dismiss when pled as alternative theories of recovery."[259]   This may be the case where a plaintiff pleads a right to recovery "not controlled by contract"[260] or where "it is the [contract], itself, that is the unjust enrichment."[261]   However, the "right to plead alternative theories does not obviate the obligation to provide factual support for each theory."[262]

Here, if the Plaintiffs prevail on their tort claims, unjust enrichment is unavailable, because an element of unjust enrichment is lack of a remedy at law, and should the Plaintiffs otherwise prevail, that element would be lacking.   Seen in this way, unjust enrichment is an alternative pleading: assuming the Plaintiffs can prove that the Moving Defendants profited, and the Plaintiffs were impoverished, as the result of the non-moving Defendants' fraud; and assuming that Plaintiffs are unable to implicate the Moving Defendants in that fraud, unjust enrichment would be invoked.   The question then is whether the underlying contract, through its

equitable remedies because money damages alone will not provide complete relief. Consequently, IDB cannot seek recovery under a claim of unjust enrichment.").

[258] *Bakerman*, 2006 WL 3927242, at *18.

[259] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at * (Del. Ch. Dec. 22, 2010); *see also BAE Sys. Info.*, 2009 WL 264088; *McPadden v. Sidhu*, 964 A.2d 1262, 1276–77 (Del. Ch. 2008).

[260] *BAE Sys. Info.*, 2009 WL 264088, at *8.

[261] *McPadden*, 964 A.2d at 1276.

[262] *Narrowstep.*, 2010 WL 5422405, at *16; *see also BAE Sys. Info.*, 2009 WL 264088; *McPadden*, 964 A.2d at 1276–77.

71

indemnification provisions, was meant to preclude such relief. The Moving Defendants argue that the Plaintiffs' unjust enrichment claim against Plimus's pre-merger stockholders does not pass the threshold inquiry because the parties' relationship is governed by a valid contract; specifically, the pre-merger stockholders "either executed the Amended Merger Agreement or, Plaintiffs assert, are bound to its indemnification provisions."[263] As to Goldman and Klahr, who did not sign the Amended Merger Agreement, the Moving Defendants argue that the existence of this contract also destroys the Plaintiffs claims, as "Plaintiffs, having bargained for the contractual remedy of indemnification, cannot seek quasi-contractual relief from non-parties to the merger contract through an unjust enrichment claim."[264]

I have discussed above the contractual provisions providing indemnification in certain circumstances and amounts under the Agreement. By limiting indemnification rights to a fund, did the parties mean to preclude a remedy for unjust enrichment arising from fraud against innocent stockholders? This matter has not been adequately addressed in briefing, and I cannot say based on the record before me that the existence of a contract precludes recovery from innocent stockholders of benefits wrongfully obtained through the fraud of those acting on their behalf as fiduciaries. Accordingly, I decline to dismiss Count VI at the

---

[263] Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 50 (citing Am. Compl. ¶ 225).
[264] *Id.*

pleading stage on the ground that an adequate remedy otherwise exists or that restitution is precluded by the contract.

The Moving Defendants also argue that SIG Management and its associated board representatives, Goldman, and Klahr, were not enriched through the merger because they did not receive any merger consideration, and their "mere association with [SIG] Fund, which received merger proceeds, is insufficient for an unjust enrichment claim."[265] The Plaintiffs, for their part, argue that it is "hyper-technical" to suggest that "Klahr, Goldman, and SIG Management could not have been enriched because they were not Plimus stockholders in their individual capacities and thus did not receive merger consideration."[266] The Plaintiffs reiterate that Goldman and Klahr, "who controlled and directed SIG Fund as its principals"[267] used their control to cause SIG Fund to vote in favor of or consent to the merger, "which had been procured through fraud."[268] If the Plaintiffs can implicate these defendants in a fraud, they obviously have a remedy at law in damages. A restitution remedy such as unjust enrichment, however, requires the party subject to the claim to hold the funds resulting from the Plaintiff's impoverishment.[269] Because the Plaintiffs have not alleged that SIG Management,

---

[265] *Id.* at 51.

[266] Answering Br. in Opp'n to Moving Defs.' Mot. to Dismiss at 47.

[267] *Id.* at 48 (citing Am. Compl. ¶¶ 24, 26–27, 41) (internal quotation marks omitted).

[268] *Id.* (citing Am. Compl. ¶ 206) (internal quotation marks omitted).

[269] SIG Fund, as a recipient of merger proceeds, could be subject to restitution if warranted after trial.

73

Goldman or Klahr received funds resulting from the fraud, restitution, as opposed to damages at law, is unavailable from those parties, and Count VI is dismissed as to them.

### 3. Declaratory Judgment

The Moving Defendants also move to dismiss Count VII, which is the Plaintiffs' request for a declaratory judgment. More specifically:

> As a result of the wrongful and fraudulent conduct alleged herein, Plaintiffs request a declaratory judgment that [Tal, Segal Itshayek, SIG, Klahr, Goldman, Herzog and Kleinberg] have no right or entitlement to and should not receive or retain any merger proceeds, in whatever form held, and that any such merger proceeds being held in whatever form by any individual or entity, whether party to this complaint or not, should be paid to or retained by Plaintiffs. Plaintiffs further request a declaratory judgment ordering that Defendant Tal surrender any stock immediately to Plimus or that, in the alternative, such stock be canceled with no recourse, relief, or other entitlement owed to Defendant Tal by Plaintiffs. Plaintiffs further request a declaration that Fremont is not obligated to pay the amounts that would otherwise be due under the promissory notes described herein.[270]

The Moving Defendants' argued that this Count sought "a declaration that mimics each substantive count of the Amended Complaint."[271]

Declaratory Judgment is a statutory action;[272] it is meant to provide relief in situations where a claim is ripe but would not support an action under common-law pleading rules.

---

[270] Am. Compl. ¶ 245.
[271] Defs' Mot. to Dismiss at 29 n.6.

A comparatively recent innovation in Anglo-American law, the declaratory judgment action is designed to promote preventive justice. The notion laying behind the innovation is that legitimate legal interests are sometimes cast into doubt by the assertion of adverse clams and that, when this occurs, a party who suffers practical consequences ought not be required to wait upon his adversary for a judicial resolution that will settle the matter.[273]

Here, however, the Plaintiffs assert immediate entitlement to a complete set of common-law and equitable affirmative remedies, in contract, tort and equity, including rescission of the contract. Because the declaratory judgment count is completely duplicative of the affirmative counts of the complaint, Count VII is dismissed.

### 4. Rescission

The Moving Defendants also moved to dismiss the Plaintiffs' request for rescission. As I communicated to the parties at oral argument, I find it inappropriate to dismiss this requested remedy at the motion to dismiss stage of litigation, because—although I find the chances vanishingly small that I would order such a remedy at this late date—whether rescission is available properly involves a fact-specific inquiry.[274]

---

[272] *See* 10. *Del. C.* § 6501.

[273] *Schick Inc. v. Amalgamated Clothing and Textile*, 533 A.2d 1235, 1237-28 (Del. Ch. 1987) (citations omitted).

[274] *See, e.g.*, *ENI Holdings, LLC v. KBR Grp. Holdings, LLC*, 2013 WL 6186326, at *24 (Del. Ch. Nov. 27, 2013) ("Rescission is not a cause of action but a remedy available only where facts indicate equity so requires. Because such an inquiry is fact specific, I decline to address it in connection with this Motion to Dismiss, except to say that KBR's burden to establish an entitlement to rescission, in light of the likely change in circumstances due to the passage of time

75

# V. CONCLUSION

For the reasons explained above, the Moving Defendants' Motion to Dismiss is granted in part and denied in part. The parties should submit an appropriate form of order.

---

here, is heavy.") (citation omitted); *Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963, 991 (Del. Ch. 2000) ("In response to a motion to dismiss, I simply determine whether plaintiff has stated a claim for which relief might be granted. If I find that plaintiffs have stated cognizable claims, then the nature of that relief is not relevant and need not be addressed. Because the determination of relief is beyond the scope of this motion and premature without an established evidentiary record, I will not address this issue." (citations and internal quotation marks omitted)); *but see Winston v. Mandor*, 710 A.2d 831, 831 (Del. Ch. 1996) (dismissing the plaintiff's request for rescission, and "conclud[ing] that where the circumstances of a challenged transaction make rescission infeasible, and where the plaintiff is not unfairly prejudiced, a motion to dismiss that remedy may be granted").